JANVIER, Judge.
This is a proceeding brought by the District Attorney for the Parish of Orleans in which, acting in his said capacity, and under authority of LSA-R.S. 13:4711 et seq., he seeks the issuance of an injunction prohibiting the use for one year of a certain building in the City of New Orleans on the ground that prostitution is being practiced in the said building. The property in which it is alleged that the practice is being conducted is described as follows:
“A lot or parcel of ground together with all the buildings, structures and improvements thereon, in the 4th Municipal District, Square 29, bounded by Rousseau, Tchoupitoulas, Philip and Jackson Avenue, forming the corner of Jackson and Rousseau and measuring 63' 11" A'" front on Jackson Avenue with the same width in the rear, having a depth of 63' 11" 3'" between equal and parallel lines and forming a portion of the original lot 66 of a survey by W. S. and C. S. Seghers, City Surveyors, of 9/14/22, the building and structure thereon bearing Municipal #468-470 Jackson Avenue.”
The defendants against whom the injunction is sought are, (1) Claiborne Realty Company, Inc., owner and lessor of the property; (2) Mrs. Josephine Cobb, the lessee of the property, who operates a barroom on the ground floor and rents out bedrooms which are on the second floor; and (3) Elizabeth Largent, who at various times has used several different alias names and who is employed as a barmaid by Mrs. Cobb.
The two female defendants, Josephine Cobb and Elizabeth Largent, filed exceptions of no cause of action and no right of action and a plea to the jurisdiction of the court ratione materiae, and an answer in which they denied all of the essential allegations of the petition. The corporate defendant, Claiborne Realty Company, Inc., the owner and lessor of the property, filed exceptions of no cause of action and no right of action, and an answer in which it denied the essential allegations of the petition, and in which it specifically averred that if prostitution was being practiced in the premises it had no knowledge thereof. The said realty company also averred that it had “acquiesced in no law violation that may have existed or taken place on said premises,” that “its hands are tied until such time as plaintiff or the proper authorities may obtain a conviction of any of the violations alleged -* * * or has furnished * * * such positive evidence of the violation of one of the conditions of said lease as would justify * * * taking action * * * for the cancellation of said lease.”
And the said defendant further specifically pleaded “the unconstitutionality of any statute the interpretation of which would penalize an innocent third party for an act or law violation which they were not a party to, did not agree to or acquiesce in or have knowledge of.”
In the Civil District Court the exceptions and the plea to the jurisdiction of the court ratione materiae were overruled and after evidence had been submitted there was judgment in favor of all three defendants dismissing the suit. The district attorney has appealed.
The exception of no cause of action is obviously not well founded. If the allegations of the petition are found to be true *252 there is no doubt that, the statute is applicable.
The exception of no right of action is based on the contention that, under the statute, the district attorney has no right to bring the action in his own name. The statute specifically provides that the “district attorney in the name and behalf of the parish * * * may maintain in a court of competent jurisdiction an action to enjoin and abate the nuisance perpetually * * LSA-R.S. 13:4712. The suit was brought by the district attorney appearing “in the name and behalf of the said Parish.” In two suits, which were appealed to this court, Parish of Orleans v. Garaflo, et al., No. 7760, [See Louisiana Digest] and Parish of Orleans v. Burglass, et al., No. 7746, of our docket, [See Louisiana Digest] and in one which was appealed to the Supreme Court, Parish of Orleans v. Brown, 147 La. 828, 86 So. 270, the proceedings were filed by the district attorney.
The plea to the jurisdiction of the Civil District Court ratione materiae is not well founded. This is not a criminal action but is a civil procedure. In each of the three cited cases the action was brought in the Civil District Court for the Parish of Orleans.
The record shows that in the premises there is on the ground floor a barroom, and there are on the second floor four furnished bedrooms and a toilet, and that in an adjoining building there are four other unfurnished and unused rooms. The bar is operated by the tenant Josephine Cobb, and in its operation she employs two barmaids, one during the day and the other, Elizabeth Largent, during the night. There is one fact which is shown beyond any possible doubt, and that is that Elizabeth Largent, the night barmaid, is a professional prostitute and has used various other names, such as, Linda Lawrence, Elizabeth James, Elizabeth Wilfong. Elizabeth Largent is. the one most commonly used by her and under it she is made defendant in this suit.
While there is some denial of certain of the, facts alleged by the district attorney and testified to by witnesses produced by him, the record amply sustains those allegations, and the real defense is not that these charges are not true, but that the proven facts do not justify the harsh remedy which is provided by the statute and under which the premises may be “padlocked” and taken completely out of commerce for one year.
It is shown that the alleged character of the place was first called to the attention of the police department of the .City of New Orleans on the morning of May S, 1954. Patrolman Earl lAdams of the police force says that “some unknown white male, who declined to * * * identify himself” informed him that “there was prostitution going on at the Cobb bar.” As a result he gave that information to two other police officers who were working in “plain clothes.” He says that these officers “handled it from then on.” Very early on the morning of May 8, 1954, he was called by these officers to meet them and was informed by them that “the barmaid went upstairs with somebody.” He says that they searched for someone who was “supposed to be up there with her,” but that he was “afraid that we neglected a gate that was on Rousseau Street which I didn’t know about.” He says that on that occasion they found no one with the barmaid, who, however, was found upstairs talking with the other officers.
Bernard Fernandez, a patrolman of the city police force, says that he was sent to the place at about three o’clock on the morning of May 6, 1954, and that he was dressed in “plain clothes.” He says that Elizabeth Largent, the barmaid, “struck up a conversation” and finally suggested that he have sexual intercourse with her and said that her price was $25. The matter was not arranged for that night, and the woman suggested that he return on the next night. Fernandez further says that on July 13, 1954, he, with other officers-, again went to the place, having been informed that this woman was soliciting a *253 man for intercourse, and that on that occasion they “went directly upstairs * * * opened one of the doors * * * and found” this woman “and a man identified as Martin Welp” both nude and lying in bed together, and that while they were not at that instant engaged in actual sexual intercourse the woman was attempting to completely arouse the lustful desires of the man.
This witness also says that on an earlier occasion at about 2:40 o’clock on the morning of May 8, 1954, he had been told that this woman had gone up to one of the bedrooms with a man, but that when the officers went upstairs they heard a noise as if “someone was in the room running” and they found a rear stairway and, looking down, saw someone, apparently a man, going out of the back gate. This person was wearing a gray suit, and, going back into the bedroom, they found a gray coat and found the woman in the bathroom adjacent to the bedroom. He says that on neither occasion did they see any money given to the woman, but that they did not search the woman’s clothes.
■Norman Decareaux, another patrolman of the police department, who also worked in plain clothes, says that at about eleven o’clock on the night of May 6, 1954, he entered the bar, and that after about twenty minutes the barmaid, Elizabeth Largent, invited him to have sexual intercourse with her and said her price was $25. She said there was no one to relieve her at the bar on that night and suggested that he return, and that at about 1:30 on the morning of May 8, 1954, he returned and the Largent woman was engaged in conversation with a man in a gray suit, and that after ten or fifteen minutes the man in the gray suit walked out of the bar and seated himself at a table which was also occupied by Josephine Cobb, the proprietress of the establishment, who was asleep. He says that when the Cobb woman woke up she went behind the bar, apparently to relieve the Largent woman, and that the Largent woman and the man in the gray suit went upstairs together. He then telephoned for other police officers and when they arrived they all went upstairs and found the Lar-gent woman in the bathroom seated on the toilet, but found no man, although they had heard someone running out the back steps; it was on that occasion that they found the man’s gray coat in the bedroom.
Girard Hirt, another policeman who also worked in plain clothes, says that on the night of July 13, 1954, he entered the bar and ordered a drink, and that while he was there a man whose name he later learned was Martin Welp came in and sat at the table next to him; that after a few minutes the Largent woman approached Welp and suggested that he could “go to bed with her” for $7, and that after a discussion $5 was agreed upon; that after a few minutes they went upstairs together and that a little later he and other officers went up and found Welp and the Largent woman entirely nude and in bed together, and that he “imagined” that they were having sexual intercourse.
Martin Welp, who was arrested when found in bed with the Largent woman, says he was accosted by her and that after agreeing on a price of $5, which he gave her, they went upstairs to bed, but that when the police interrupted them they had not actually commenced sexual intercourse but were “beginning to begin.”
The only witness who testified for the defendants concerning the actual occurrences was Josephine Cobb. She says that she rents this building from the other defendant, Claiborne Realty Company, Inc. ; that she has never been convicted of any crime or misdemeanor; that she is the proprietress of the bar, and that she rents the upstairs rooms to seamen; that she employs two barmaids, the Largent woman and another.
She says that until the “raid” took place she knew nothing about any such occurrences, particularly about the facts leading to the occasion on which Welp was found in bed with the Largent woman. She remembered the occurrence on May 8 when the Largent woman was found in the bathroom and the gray coat was found in the bedroom, but she makes the rather signifi *254 cant statement that “there was nothing going on.”
She says that the gray coat belonged to a seaman “who was out on a trip to Africa,” and that often when seamen go out to sea “a lot of them leave their clothes” behind.
So far as the Claiborne Realty Company, Inc., is concerned, Miltner J. Goll, who is general manager, says that he has “over all of the say so,” and that that company had no knowledge of any improper occurrences in the property which it leased to Josephine Cobb, and that under the lease the lessee is not permitted to carry on any illegal or unlawful practice. He was shown a copy of a letter written to the realty company on May 25, 1954, by Harry J. Daniels, Chief of Detectives, and stated that he had received the letter, which had been sent by registered mail. That letter reads as follows:
“Registered Return May 25, 1954 Receipt Requested
“Claiborne Realty Co. Inc.
936 Royal Street
New Orleans, Louisiana
“Dear Sir:
“On May 8, 1954, Elizabeth Langent, Josephine Cobb and James Watson were arrested from 470 Jackson Avenue and affidavit was filed against them in Recorder’s Court with Ordinance 14477 relative to prostitution and Ord. 1436, no visible means of support.
“City records indicate that you are the owner of property 470 Jackson Avenue and therefore we are notifying you of these violations being committed on your property.
“It is the policy of this Department when such violations are found in premises which are owned by a party or corporation, other than the operator himself, to notify such owner or corporation of these violations. It is felt that in many cases the property owner is unaware of such a situation existing at a location which he leases and would desire to correct the situation. It is also the policy of this Department, that if another violation of the law occurs in this same location at a later date, that the District Attorney’s office will be apprised of these facts for the purpose of any possible charges which might be made against the owner.
“Please advise by letter in order that we may be informed as to what steps you are taking to correct the situation above mentioned.
“Yours truly,
“Harry J. Daniels
“Chief of Detectives”
Goll stated that on receipt of that letter he had discussed the matter with the attorney for the company, who had told him that he would answer the letter and had also advised him that nothing could be done unless and until a conviction could be obtained by the state or the city, and he produced a copy of the letter which the attorney had written in answer to that of Detective Daniels. That letter reads as follows:
“June 15, 1954.
“Department of Police
“New Orleans, La.
“Re: No. 470 Jackson Ave.
“Gentlemen:
“Receipt is acknowledged of your letter dated May 25, 1954, addressed to Claiborne Realty Co. Inc., relative violations that occurred at the above address.
“The property is under lease to a Mrs. Cobb, and while we are looking into the matter, it is my opinion that the lessor is unable to take any steps until there is a conviction.
“Assuring you of our coopereration (sic) I would appreciate being advised of the outcome of the charges.
“Yours very truly”
*255 On behalf of the realty company it is contended that an injunction may not be granted because the realty company had no knowledge of any of the alleged occurrences, and on behalf of the other defendants it is contended that even if the acts complained of actually occurred, they do not indicate that within the contemplation of the statute “assignation or prostitution is carried on, conducted, continued or permitted, or exists.” The real contention is that there is proof of only one single occurrence, and that even as to that occurrence it is conceded that there was no actual sexual intercourse, even if it could be assumed that intercourse could have been indulged in but for the interruption by the police. In support of this contention that even if there had been proof of one such act that would not have justified the closing of the premises, counsel for defendants direct our attention to two unreported decisions by this court: Parish of Orleans v. Burglass, et al., No. 7746 of our docket, decided March 22, 1920, [See Louisiana Digest] and Parish of Orleans v. Garaflo, et al., No. 7760 of our docket, decided April 19, 1920 [See Louisiana Digest]. It is true that in those cases it was held that a single immoral act or even a series of immoral acts by the same persons does not constitute the conducting of prostitution. However, we think that the record which is before us clearly evidences that although only one woman was actually involved, she actually offered herself to anyone who was willing to pay her price, and it seems to us that even though there may be only one prostitute in such a place, if she makes herself available to any man who is willing to pay her price the place wherein she conducts her trade must be classified as a place where prostitution is carried on. It is true also that in those cases we said in effect that it seems almost impossible to successfully conduct a house of prostitution without the necessary publicity which will bring customers to the place, and that consequently seldom is such a place conducted without the knowledge thereof permeating the neighborhood. But we think that what we said in those cases did not mean that unless there is proof of general knowledge in the neighborhood such an establishment could not be closed under the statute. So far as general knowledge is concerned, if there is general knowledge in the neighborhood that in such a place prostitution is carried on, that is sufficient to permit the invocation of the statute, even without proof of any specific occurrences. The statute so provides, for in LSA-R.S. 13:4717 appears the following:
“On the hearing in any action filed under the provisions of R.S. 13:4711 through 13:4717 evidence of the general reputation of the building, structure, land or other place or of the defendant or of the occupants thereof or habitual visitors thereto shall be admissible, and judgment may be based on the general reputation so proven.”
This clearly means that, where such a place bears such a general reputation, proof of specific acts is not necessary. On the other hand, we think that, although it is generally recognized that when such practices are frequently indulged in, seldom indeed does the neighborhood fail to have knowledge thereof to some extent, still there may be cases in which although there is no evidence of general knowledge there is evidence of repeated occurrences, and we think that in such cases the statute may be invoked even though there is no proof of general reputation. As a matter of fact, however, here the record shows that on at least two occasions rumors were reported to the police, which would indicate that there was some knowledge in the neighborhood of the practices which were being conducted.
Here there is proof that on several occasions the Largent woman offered herself to several men, and on one occasion a man ran out of the room when the police approached, and there is in addition proof of one occasion in which she was caught “in the very act.”
It is said, however, that the proof of solicitation, however frequent, is not proof of prostitution, and that even if the proof of solicitation could be considered it does not necessarily follow that solicitation *256 would have resulted in prostitution on the premises.
We think that in order that it be shown that prostitution is practiced it is not necessary that there he proof such as might be required where there is involved a criminal prosecution, as it seems to be well settled that the mere offering by a woman of her body to indiscriminate intercourse with men constitutes prostitution.
Should it be held that proof of actual intercourse is necessary, seldom if ever would the district attorney be successful in such an action, for it is obvious that the timing of the appearance of, the police would have to be more accurate than is ever possible in such a situation.
In criminal cases it may be that proof of actual intercourse is necessary, and counsel for defendants argue that because of the definition of prostitution which appears in our criminal code, LSA-R.S. 14:82, it is essential that there be proof of actual intercourse before the penalty which the district attorney seeks to enforce is applicable. In our criminal code prostitution is defined as “the practice by a female of indiscriminate sexual intercourse with males for compensation.”
In the same criminal code, in article 6, it is provided that “Nothing in this Code shall affect any civil remedy provided by the law pertaining to civil matters, * * Furthermore, it is provided in section 3 of the enacting statute, Act 43 of 1942, that nothing in the criminal code shall affect any of the provisions of Act 47 of 1918, which, as we have shown, is now LSA-R.S. 13:4711 et seq.
Surely it cannot be necessary in a civil case such as this, for the purpose of the statute is to prevent just what is shown to have occurred here. As a matter of fact, however, even if proof of actual intercourse is necessary, there is in this record proof of one instance in which intercourse was just about to commence, and there is proof of another incident when the man who unquestionably was involved or was about to be involved ran out of the room, and there is proof of the several other instances of solicitation.
In his contention that the mere offering by a woman to indulge in sexual intercourse for pay constitutes prostitution, the district attorney directs our attention to the decision of our Supreme Court in State v. Thibodeaux, 136 La. 935, 67 So. 973, 974, in which it is stated that prostitution “ ‘is the practice of a female offering her body to an indiscriminate intercourse with men’ ”. We ' have no doubt that, with the knowledge and consent of Josephine Cobb, Elizabeth Lar-gent was “ ‘offering her body to an indiscriminate intercourse with men’”. However, when our Supreme Court, in the Thibodeaux case, quoted with approval from the definition of the word “prostitution” in which it was said that prostitution is the “offering” of the body to an indiscriminate intercourse, we think that the Court did not actually intend to point to a distinction between offering to indulge in sexual intercourse and the actual indulgence therein, as it seems that what was involved was not the difference between the offer and the consummation, but was rather whether sexual intercourse between one man and one woman, however frequently indulged in, constituted prostitution.
Nevertheless, we are of the firm conviction that within the contemplation of the statute prostitution is engaged in and is conducted where it appears that one woman offers herself to several men indiscriminately and solicits their participation, even though there is no proof by an actual eyewitness of indulgence in a sexual act.
It is well known that before this statute was enacted, when houses of prostitution operated in restricted districts without interference, many of the “cribs” were occupied by only one woman in each, and that they solicited or “offered” themselves through the front doors or windows.
Surely, it could not be successfully contended in such cases that there was no proof of prostitution merely because there may have been no evidence by eye *257 witnesses of the actual porformance of the act. In fact, in the Thibodeaux case the Court used other language in defining the word “prostitution,” which we think rather clearly indicates that the Court felt that prostitution is indulged in where a woman offers herself for sale, even though actual intercourse may not result. The Court said:
“ ‘In its most general sense, prostitution is the setting one’s self to sale * * * >»
The only question which remains is whether knowledge on the part of the owner, Claiborne Realty Company, Inc., was shown or was necessary, and whether, if it was not necessary, the act is violative of the Constitution of the United States in that it deprives an owner of property without due process. The constitutionality of the statute was attacked in Parish of Orleans v. Brown, 147 La. 828, 86 So. 270, 271. There the Supreme Court said:
“Defendant having been proceeded against under this act as owner of a building so used, and having been condemned, assails the constitutionality of said act on the ground that it deprives her of her property without due process of law.
“Though she is appellant, no appearance has been made for her in this court.
“The point she thus raises is obviously without merit, as has heretofore uniformly been decided. State ex rel. Wilcox v. Gilbert, 126 Minn. 95, 147 N.W. 953, 5 A.L.R. 1449; State ex rel. English v. Fanning, 96 Neb. 123, 147 N.W. 215; People ex rel. Thrasher v. Smith, 275 Ill. 256, 114 N.E. 31, L.R.A. 1917B, 1075.”
When we come to consider the facts in connection with the question of whether the owner of property is deprived of it without due process, we find two things: first, that the owner of the property here in fact had actual knowledge. It was informed by the district attorney and it failed to act, not because it did not have knowledge, but because it took the position that it could not act except after a conviction by the proper authority. In that position it was in error. The second fact which we consider in connection with the plea that the act is unconstitutional is that the owner in good faith is given opportunity by the mere furnishing of bond to reopen his property and to again devote it to proper commercial use.
Our conclusion is that it has been shown that in the premises in question prostitution was being conducted and consequently the injunction sought by the district attorney should be issued.
The judgment appealed from is annulled, avoided and reversed, and it is now ordered, adjudged and decreed that the rule of the district attorney be made absolute and accordingly that a writ of injunction issue and be perpetuated and that the defendants, Mrs. Josephine Cobb and Elizabeth Lar-gent, be and they are enjoined and restrained from further conducting or permitting acts of prostitution in the premises Nos. 468-470 Jackson Avenue, or any part thereof, and that an order of abatement issue ordering the effectual closing of the building and the entire premises and prohibiting its use for any purpose for a period of one year unless all costs be paid and a bond be furnished in accordance with LSA-R.S. 13:4715.
Reversed.
Injunction issued.