CULPEPPER, Judge.
In accordance with the provisions of LSA-R.S. 13:4711 et seq., Morgan J. Gou-deau, III, District Attorney, filed this suit on behalf of the Parish of St. Landry to abate and enjoin the public nuisance of prostitution allegedly conducted on the premises owned by the defendant, Joseph Veillon.
On May 22, 1974, the trial judge issued an ex parte temporary restraining order against the practice of prostitution on defendant’s premises and the removal of any movable property from the premises. The court also ordered defendant to show cause at a hearing to be held on May 27 why he should not be enjoined from using the premises for any purpose for one year.
The defendant filed an exception urging the unconstitutionality of the abatement statute, LSA-R.S. 13:4711-4717 (as amended, 1970). He also answered, alleging that if the acts of prostitution actually occurred on his premises, they occurred without his knowledge or consent. After a hearing on May 27, 1974, the district judge held (1) the statutes are constitutional as regards prostitution, (2) the alleged acts of prostitution were committed, and (3) they were committed with defendant’s knowledge and consent. The judge issued an order declaring the “Old Turf Lounge” a public nuisance due to the existence of prostitution on the premises, enjoined the practice of prostitution on the premises, and closed the lounge for one year for any purpose. Defendant appealed.
The substantial issues are: (1) Did the alleged acts of prostitution occur? (2) Did the acts occur with defendant’s knowledge and consent? (3) Is the statute unconstitutional ?
The “Old Turf Lounge” is a bar and nightclub on U. S. Highway 167 in St. Landry Parish. The defendant purchased the land and the lounge from Clifton Thi-bodeaux on May 17, 1973. South of defendant’s land is other property owned by Thibodeaux upon which Thibodeaux operates the “Gunfighter” lounge, or “New Turf Lounge”. To the rear of both “Turf” lounges, behind a fence located on the Thibodeaux property, is a group of trailers known as “D-Lodge”.
Three undercover state police agents testified they had been solicited by a black female employee of the “Old Turf Lounge” to engage in acts of sexual intercourse with her for an agreed price.
State Trooper Harry L. Courville testified that he and two other agents entered the “Old Turf Lounge” about 11:00 p. m. on May 2, 1974 and sat at a table in the rear of the lounge. Courville then moved to the front of the lounge and sat at a table near the jukebox. While seated at this table, he observed a black female serving drinks and “go-go” dancing on a stage. Thereafter, he was approached by this girl who identified herself as “Sammie Gir-ard”. She then asked him if he wanted a date with her. He asked her what she meant, and the girl said that she would have sexual intercourse with him at a price *832 of $50 for four hours if he would get a room.
Courville also testified that the “Old Turf Lounge” had the reputation of being a place where prostitution was solicited. However, he stated that he knew of no acts of sexual intercourse which occurred on the premises; that there were no accommodations, such as beds, to commit intercourse on the premises; and that he did not know if the owner of the lounge had any knowledge of his solicitation by “Sammie”. His testimony also reflects that he has known the owner of the lounge since October, 1973, but does not remember seeing him in the lounge that night. Leroy Dugas, a state police narcotics agent, testified he had been in the “Old Turf Lounge” on four or five occasions. On the night of May 10 he arrived at the lounge about 1:00 a. m. Upon entering, he sat at the bar and drank a couple of beers. While seated at the bar, he was approached by a black female who gave her name as “Sammie Nelson”. She asked him to buy her a drink and he did. Sammie then asked Agent Dugas if he was interested in having a sex party at his place with her for a price of $100 an hour. He told her that he did not have that much money and she walked away. Thereafter, Agent Dugas left the lounge.
Dugas does not know the owner of the “Old Turf Lounge”, and therefore testified that he would not have known of the owner’s presence in the lounge that night. Nor could he testify that the owner knew he had been solicited by “Sammie”.
State Trooper Nolton Wilson was working with Agent Dugas on the night of May 10. When he sat down at the bar he was served a drink by the bartender. Thereafter, he was approached by the same black female who first asked him to buy her a drink. After he did so, she asked if he wanted to go to bed with her for $50. Sammie also said she would french date for $100. However, he admits that she did not propose where the act of intercourse was to take place. Wilson left the lounge after he told her he did not have the money.
Wilson also testified that he had no knowledge of any beds in the “Old Turf Lounge”. He testified that Veillon was sitting at a card table near the restroom a good distance from the bar where he had been approached. He did not know if the defendant was aware of him being approached by Sammie, nor did he inform the defendant afterward about the solicitation.
Both Agent Dugas and Trooper Wilson went to “D-Lodge” which is located about 75 or 100 feet to the rear of the “Old Turf Lounge” across a high fence. Officer Wilson said there were beds in the lodge and they found prostitution being conducted on the premises. Agent Dugas said he had been solicited there. Neither had any idea who owned the D-Lodge, but Wilson said he arrested a white female for prostitution at this place.
Lt. Louis M. Ackel, regional supervisor of detectives for the State Police, also testified. He says that he has been in the “Old Turf Lounge”, knows its owner, and is familiar with the investigation of the lounge since October, 1973.
The first investigation was a narcotics raid on the “hill”, referring to the two “Turf” lounges and the trailers and apartments.
On November 2nd or 3rd, 1973, a vice raid was conducted. The officers conducting the raid had search warrants for “B-drinking and prostitution” violations, i. e., in the vernacular, “Trick books”. On that raid they seized several spiral notebooks in the “Old Turf Lounge”. Lt. Ackel said that many times when the police had gone into the lounge Veillon was not there and was later called. However, Lt. Ackel has seen Veillon seated in the back card room near the restrooms and has also seen the defendant behind the bar near the cash register.
*833 The notebooks were taken from behind the bar after the defendant told Lt. Ackel where they were located. Upon examination, Lt. Ackel found they contained the names of certain females.
Joyce Ruth Hearne and Marie Dawn Gurdurt, two of the girls listed in the book, explained to the police what was in the books. They said there are certain markings therein representing the drinks customers buy the girls after being solicited to do so. This solicitation of drinks by barmaids in a lounge is known as “B-drinking”.
Ackel claims that the books were supposed to have “Tricks”, i. e., acts of prostitution in them as well. However, he could not tell from the notebooks alone which of the notations represented solicited drinks or if any of the notations represented tricks.
Lt. Ackel testified that Veillon had once been charged for soliciting minors into prostitution based upon information furnished the police by Joyce Ruth Hearne and Marie Dawn Gurdurt, both of whom were minors while they worked for Veillon at the “Old Turf Lounge”. He says that Joyce Hearne worked for Veillon as late as October, 1973. He also testified that he tried to serve a subpoena on Joyce Ruth Hearne for the present hearing at a house in Lafayette which he believed was owned by the defendant, but she was not there. Ackel further testified that he had never been approached by Sammie, that there are no beds in the “Old Turf Lounge”, but that there are beds in an adjoining building, the owner’s quarters.
Nolan G. Savoie, a local resident, testified that he passed the lounge every day. On the way back from Lafayette one evening, Savoie and two of his fellow employees stopped at the “Old Turf Lounge”. After some persuasion by the driver of their car, Mr. Savoie consented to go in the lounge. All three ordered drinks. A young white girl came by and asked if they would buy her a drink. Savoie gave her $10 to pay for all of the drinks.
Savoie’s friend, Buddy, dared him to ask the girl if he could “shack up with her”. Savoie asked her, “Babe, I say how much?” She said, “$50”. He replied, “Go play with chickens.” After she left, the three men finished their drinks and left the bar.
Mr. Savoie said he jokingly asked the girl if she wanted to have sexual intercourse. He testified that he was quite happy with his wife and children at home and had absolutely no intention of having intercourse with the girl.
Robert Dejean, attorney for the defendant, testified that an instanter subpoena had been issued by the State of Louisiana for “Sammie” to appear at the hearing. However, she could not be located. The parties stipulated that if she were present she would testify as follows: (1) She began working for the defendant about March, 1974 and (2) When initially employed, she was admonished “not to discuss anything personal with . . . any customers and that her sole duties were those of a waitress and a dancer.”
Finally, the defendant himself testified. He testified that he owns the lounge and lives to the rear of it in a building on the “hill”. He says that he moved in this building after two fires had occurred at his lounge. He also says his little boy stays in this building with him on the week ends and that the young boy is not permitted in the lounge. The record reflects that Mr. Veillon has been in the business of operating lounges for some 18 years.
He admits purchasing the “Old Turf Lounge” on May 17, 1973 after which he began the operation of his lounge. When asked if he knew Sammie, he said he knew “of her”. He admitted she worked for him and that the last time he saw her was about 10 days before the hearing. He says Sammie was employed as a waitress and *834 dancer. However, he claims he had no knowledge that Sammie ever solicited any male for prostitution on his premises. He says her husband brought her to work and picked her up every evening.
However, he admits having knowledge that another girl who worked for him had solicited men for prostitution at his establishment. He claims that she was fired, and that he has no knowledge of any other solicitation which occurred on his premises.
Defendant testified that the notebooks are only a record of the drinks each girl sells. The reason the books are used, he insists, is so that the girl who sells the most drinks gets a weekly bonus and better job security. He claims customers offer the girls drinks and that the girls do not solicit drinks from the customers. He also asserts that he will dismiss girls when he finds out that they have solicited drinks from the customers. However, if the girls solicit drinks, they are marked in the books with Veillon’s approval because the lounge receives the money for the drinks solicited.
He admits knowing Joyce Ruth Hearne since April, 1973 before he bought the “Old Turf Lounge”. He identified Exhibit P-9 as her picture taken while she worked for Thibodeaux, which shows her name as “Cindy Meeker”, apparently an alias. The picture was taken on April 26, 1973, when she was arrested on a “B-drinking charge”. According to his testimony Joyce worked for him after he bought the lounge until the following July. He claims that she was fired when he learned that she was only 17 years old.
Veillon says he “made her move out of the place on the promise that she went to Lafayette.” She then went to live with Rex Ford, who had killed an undercover narcotics agent. About two weeks before the hearing, she was living in a house in Lafayette, defendant paying the rent. Defendant also admitted visiting Joyce at that house. He claims she left when she began receiving “crazy” phone calls.
Defendant says Joyce came to his bar as a customer several times after he released her from his employment in July, but that she no longer worked for him. He testified Joyce left the area about a week before the hearing, and he does not know where she is.
There was another minor girl working for Veillon whose name is Marie Dawn Gurdurt. However, he says that by the time he learned she was not of age, she had then reached the age of 18.
Veillon denies the truth of any statements given to the police, either local or state, by Joyce Hearne or Marie Gurdurt, in which they implicated him as hiring at least one of them to work as a prostitute as late as October of 1973. He claims the statements given are absolutely untrue. He flatly denies that he ever had anything to do with any solicitation of or hiring for prostitution in connection with the operation of the “Old Turf Lounge”. He denies that any act of prostitution was permitted on the premises owned by him.
Defendant’s -first contention is that plaintiff failed to prove prostitution was conducted on his premises. LSA-R.S. 13:4711 provides the definition of prostitution shall be derived from the criminal laws of the State of Louisiana. LSA-R.S. 14:82 defines prostitution as the “practice by a female of indiscriminate sexual intercourse with males for compensation.” It has been held in Hubert v. Claiborne Realty Company, 78 So.2d 249 (La.App.Orl.1955) that within the contemplation of LSA-R.S. 13:4711 et seq. “prostitution is engaged in and is conducted where it appears that one woman offers herself to several men indiscriminately and solicits their participation, even though there is no proof by an actual eyewitness of indulgence in a sexual act.” The court held “It seems to be well settled that the mere offering by a woman of her body to indiscriminate intercourse with men constitutes prostitution.” Bv analogy, the courts have *835 defined the word “practice” in R.S. 14:82 as the offering of oneself for intercourse for hire, State v. Bourg, 248 La. 844, 182 So.2d 510 (1966).
There is no direct evidence that a physical act of sexual intercourse took place on the defendant’s premises. However, it is clearly proved that solicitation for prostitution occurred at the establishment. A black female employee known as “Sammie” offered herself for intercourse for hire with three different state police officers on two separate occasions. In addition, another white female employee offered herself to a local resident for intercourse for hire. For these reasons, it is clear that prostitution was conducted at the establishment owned by the defendant, known as the “Old Turf Lounge.”
The second question raised by the defendant is the constitutionality of LSA-R. S. 13:4711 through 4717, particularly Sections 4712 and 4714. LSA-R.S. 13:4711 declares any place a nuisance where there exists prostitution as defined by the criminal laws of the State. R.S. 13:4712 provides the procedure for an ex parte temporary injunction and for permanent injunction after hearing on a rule nisi to abate the nuisance. R.S. 13:4713 provides contempt penalties for violation of any of these provisions relating to the injunction and for lien upon and seizure and sale of the property where the nuisance was conducted for the fines imposed upon a finding of contempt. R.S. 13:4714 authorizes the court to close the premises where the nuisance existed so that they cannot be used for any purpose for a period of up to one year. R.S. 13:4715 and 4716 provide for bond for release of the property and disposition of fines and collection of fees. R.S. 13 :4717 provides that judgment as to what constitutes a nuisance may be based upon the general reputation so proven.
Defendant argues that this establishment has been closed for a year under the statute without any knowledge on his part of the acts of solicitation, which closing constitutes a taking of his property without due process of law in violation of La. Constitution, Art. 1, Sec. 2 (1921), and the Fourteenth Amendment to the United States Constitution.
Defendant relies primarily on the following language from Society to Oppose Pornography, Inc. v. Thevis, 255 So.2d 876 (Ct. of App. 4th Cir. 1971):
“Nevertheless, insofar as the statute’s injunction might deprive an unknowing and unparticipating owner of his property, especially property employed in expression, on a statutory declaration the owner simply as owner ‘shall be guilty of maintaining a nuisance, and shall be enjoined’, it cannot meet the due process requirements of La.Const. art. 1 § 2, nor the prohibition against curtailment of restraint of freedom of speech and press of art. 1 § 3.”
In the Thevis case, the trial court ordered the premises closed and padlocked for one year. The Court of Appeal modified the judgment to limit the injunction to the prohibition of the continued existence of the nuisance, deleting that portion of the order closing and padlocking the premises. The court in Thevis said that much of the attack on the constitutional validity of the nuisance statute depends upon “the patent invalidity of the legislative requirement that the trial court ‘shall’ issue a ‘temporary injunction’ on presentation of an authorized petition, thus abandoning the judicial function of determining (at least preliminarily) whether obscenity is present.” However, the court points out that no temporary restraining order had been issued. The trial judge granted the injunction only after a hearing on the rule.
The Thevis case is distinguished from the present matter. Thevis involved the closing and padlocking of a theater for one year for the alleged showing of obscene movies. The rationale of the decision is that there is a fine line between what is *836 obscene and what may be constitutionally protected speech. To determine where the line should be drawn, a judicial determination is required to establish probable cause that obscenity in fact is being- exhibited at a theater. The present case involves the closing of a lounge because prostitution was conducted on the premises. Prostitution is well defined by the statutes enacted by our legislature and the existing jurisprudence. A determination of the exist-tence of prostitution at a particular establishment is relatively simple.
The defendant agrees that the decision of our Supreme Court in Gulf States Theatres of Louisiana, Inc. v. Richardson, 287 So.2d 480 (La.1973), held the nuisance statute unconstitutional only as it attempts to regulate obscenity and that the court was not dealing there with the taking of property of an unknowing and unsuspecting owner without due process of law. Justice Bar-ham in his explanation of the history of the nuisance statute further alludes to the obvious distinction between the regulation of prostitution as opposed to the control of obscenity:
“Through development of a special civil action for the abatement of the nuisance of prostitution, our Legislature provided that houses of prostitution could be abated upon the petition of the district attorney or upon the petition and proper affidavit of interested parties. But the control of the act of prostitution is in no wise analogous to the control of obscenity. Although it may be possible to incorporate in some manner under the title ‘Abatement of Public Nuisances’ the control of places where obscene expression is exhibited, published, or otherwise communicated, there is no corollary between control of the nuisance of prostitution and control of expressions which are subject to regulation only when they cross over that fine line into obscenity. A reading of R.S. 13:4711-4717 in light of their development and in light of their original purpose of controlling only the nuisance of prostitution makes apparent the reasons for the numerous attacks upon these statutes when they are used to control obscenity. The provisions must then be examined with careful consideration of the guarantees of freedom of expression afforded by the United States Constitution, Fourteenth and First Amendments, and Louisiana Constitution Article I, Section 3.”
It has been held that the the act providing for the closing of premises where prostitution is conducted did not deprive the owner of property without due process where the owner has actual knowledge of the conduct of prostitution on the premises, Hubert v. Claiborne Realty Company, supra.
The trial court in the instant case found as a fact that the owner had knowledge of the prostitution conducted on his premises. The record reflects that his finding of fact is reasonably supported by the totality of the evidence. This court should not disturb reasonable factual determinations made by the trier of fact, Canter v. Koehring Company, 283 So.2d 716 (La.1973)
We conclude that LSA-R.S. 13:4711 et seq., particularly Sections 4712 and 4714, are constitutional when applied to premises upon which prostitution is conducted where the owner had actual knowledge thereof.
We are further supported in our position by the recent decision of the United States Supreme Court in Mitchell v. W. T. Grant Company, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), holding the Louisiana sequestration procedure constitutional on its face and as applied because the procedure as a whole protects the respective interests of the buyer and seller by providing judicial control from beginning to end. The court therein stated:
“Petitioner asserts that his right to a hearing before his possession is in any *837 way disturbed is nonetheless mandated by a long line of cases in this Court, culminating in Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), and Fuentes v. Sheven, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). The pre-Sniadach cases are said by petitioner to hold that ‘the opportunity to be heard must precede any actual deprivation of the property.’ Their import, however, is not so clear as petitioner would have it: they merely stand for the proposition that a hearing must be had before one is finally deprived of his property and do not deal at all with the need for a pretermination hearing where a full and immediate post-termination hearing is provided. The usual rule has been ‘[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.’ Phillips v. Commissioner, 283 U.S. 589, 596-597, 51 S.Ct. 608, 611, 75 L.Ed. 1289 (1931).”
In the present case, an ex parte temporary injunction issued on May 22 to prohibit the practice of prostitution on defendant’s premises and prevent the removal of any movable property from the premises. After five days, a hearing was held to determine whether the premises should be closed and padlocked for one year. The injunction permanently closing and padlocking the premises for one year was issued only after this contradictory hearing. For this additional reason, we find that the statute in question satisfied the due process requirement of La. Constitution, Article 1, Section 2 (1921) and the Fourteenth Amendment to the United States Constitution.
For the reasons assigned, the judgment appealed as affirmed. All costs of this appeal are assessed against the defendant appellant.
Affirmed.