# MITCHELL *v.* W. T. GRANT CO.

No. 72–6160.   Argued December 4, 1973—Decided May 13, 1974

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 623. BRENNAN, J., filed a dissenting statement, *post*, p. 636. STEWART, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, and in which BRENNAN, J., joined in part, *post*, p. 629.

*Robert J. Hobbs* argued the cause for petitioner. With him on the briefs was *John W. Reed.*

*Thomas J. O'Sullivan* argued the cause for respondent. With him on the brief was *Marshall J. Favret.**

MR. JUSTICE WHITE delivered the opinion of the Court.

In this case, a state trial judge in Louisiana ordered the sequestration of personal property on the application of a creditor who had made an installment sale of the goods to petitioner and whose affidavit asserted delinquency and prayed for sequestration to enforce a vendor's lien under state law. The issue is whether the sequestration violated the Due Process Clause of the Fourteenth Amendment because it was ordered *ex parte,* without prior notice or opportunity for a hearing.

I

On February 2, 1972, respondent W. T. Grant Co. filed suit in the First City Court of the City of New Orleans, Louisiana, against petitioner, Lawrence Mitchell. The petition alleged the sale by Grant to Mitchell of a refrigerator, range, stereo, and washing machine, and an overdue and unpaid balance of the purchase price for said items in the amount of $574.17. Judgment for

*William J. Guste, Jr.,* Attorney General, *Warren E. Mouledoux,* First Assistant Attorney General, and *Louis M. Jones,* Assistant Attorney General, filed a brief for the State of Louisiana as *amicus curiae.*

that sum was demanded. It was further alleged that Grant had a vendor's lien on the goods and that a writ of sequestration should issue to sequester the merchandise pending the outcome of the suit. The accompanying affidavit of Grant's credit manager swore to the truth of the facts alleged in the complaint. It also asserted that Grant had reason to believe petitioner would "encumber, alienate or otherwise dispose of the merchandise described in the foregoing petition during the pendency of these proceedings, and that a writ of sequestration is necessary in the premises." Based on the foregoing petition and affidavit, and without prior notice to Mitchell or affording him opportunity for hearing, the judge of the First City Court, Arthur J. O'Keefe, then signed an order that "a writ of sequestration issue herein" and that "the Constable of this court sequester and take into his possession the articles of merchandise described in the foregoing petition, upon plaintiff furnishing bond in the amount of $1,125." Bond in that amount having been filed by the respondent, the writ of sequestration issued, along with citation to petitioner Mitchell, citing him to file a pleading or make appearance in the First City Court of the city of New Orleans within five days. The citation recited the filing of the writ of sequestration and the accompanying affidavit, order, and bond. On March 3 Mitchell filed a motion to dissolve the writ of sequestration issued on February 2.[1] The motion asserted that the personal property at issue had been seized under the writ on February 7, 1972, and claimed, first, that the goods were exempt from seizure under state law and, second, that the seizure violated the Due Process Clauses of the State and Federal Constitutions

---

[1] The motion asked for dissolution of the writ with respect to the refrigerator, stove, and washer. For some reason, unexplained by the parties, the motion was not addressed to the stereo.

in that it had occurred without prior notice and opportunity to defend petitioner's right to possession of the property.[2] The motion came on for hearing on March 14. It was then stipulated that a vendor's lien existed on the items, arguments of counsel were heard, and on March 16 the motion to dissolve was denied. The goods were held not exempt from seizure under state law. The trial court also ruled that "the provisional seizure enforced through sequestration" was not a denial of due process of law. "To the contrary," the trial judge said, "plaintiff insured defendant's right to due process by proceeding in accordance with Louisiana Law as opposed to any type of self-help seizure which would have denied defendant possession of his property without due process." The appellate courts of Louisiana refused to disturb the rulings of the trial court, the Supreme Court of Louisiana expressly rejecting petitioner's due process claims pressed under the Federal Constitution. 263 La. 627, 269 So. 2d 186 (1972). We granted certiorari, 411 U. S. 981 (1973), and now affirm the judgment of the Louisiana Supreme Court.

## II

Petitioner's basic proposition is that because he had possession of and a substantial interest in the sequestered property, the Due Process Clause of the Fourteenth Amendment necessarily forbade the seizure without prior notice and opportunity for a hearing. In the circumstances presented here, we cannot agree.

---

[2] There is some dispute between the parties as to when the writ was actually executed by the sheriff. The sheriff's return, furnished by petitioner but apparently not in the record below, indicates that execution was on the 18th of February, rather than on the 7th. The Louisiana Supreme Court assumed that the writ was executed on the 7th. Because we see no legal consequence attaching to a choice of dates, we assume for purposes of decision that the writ was executed on the 7th.

Petitioner no doubt "owned" the goods he had purchased under an installment sales contract, but his title was heavily encumbered. The seller, W. T. Grant Co., also had an interest in the property, for state law provided it with a vendor's lien to secure the unpaid balance of the purchase price. Because of the lien, Mitchell's right to possession and his title were subject to defeasance in the event of default in paying the installments due from him. His interest in the property, until the purchase price was paid in full, was no greater than the surplus remaining, if any, after foreclosure and sale of the property in the event of his default and satisfaction of outstanding claims. See La. Code Civ. Proc. Ann., Art. 2373 (1961).[3] The interest of Grant, as seller of the property and holder of a vendor's lien, was measured by the unpaid balance of the purchase price. The monetary value of that interest in the property diminished as payments were made, but the value of the property as security also steadily diminished over time as it was put to its intended use by the purchaser.

Plainly enough, this is not a case where the property sequestered by the court is exclusively the property of the defendant debtor. The question is not whether a debtor's property may be seized by his creditors, *pendente lite,* where they hold no present interest in the property sought to be seized. The reality is that both seller and buyer had current, real interests in the property, and the definition of property rights is a matter of state law. Resolution of the due process question must take account not only of the interests of the buyer of the property but those of the seller as well.

With this duality in mind, we are convinced that the

---

[3] Article 2373 and other pertinent provisions of the Code, including those referred to in the text, are set out in the Appendix to this opinion.

Louisiana sequestration procedure is not invalid, either on its face or as applied. Sequestration under the Louisiana statutes is the modern counterpart of an ancient civil law device to resolve conflicting claims to property. Historically, the two principal concerns have been that, pending resolution of the dispute, the property would deteriorate or be wasted in the hands of the possessor and that the latter might sell or otherwise dispose of the goods. A minor theme was that official intervention would forestall violent self-help and retaliation. See Millar, Judicial Sequestration in Louisiana: Some Account of Its Sources, 30 Tul. L. Rev. 201, 206 (1956).

Louisiana statutes provide for sequestration where "one claims the ownership or right to possession of property, or a mortgage, lien, or privilege thereon . . . if it is within the power of the defendant to conceal, dispose of, or waste the property or the revenues therefrom, or remove the property from the parish, during the pendency of the action." Art. 3571. The writ, however, will not issue on the conclusory allegation of ownership or possessory rights. Article 3501 [4] provides that the writ of sequestration shall issue "only when the nature of the claim and the amount thereof, if any, and the grounds relied upon for the issuance of the writ clearly appear from specific facts" shown by a verified petition or affidavit. In the parish where this

---

[4] Historically, the writ would issue only if the creditor had "good reason to fear" that the debtor would damage, alienate or waste the goods, and the creditor was required to show the grounds for such fear. Under present law, however, the apprehension of the creditor is no longer the issue, and the writ may be obtained when the goods are within the power of the debtor. Reporter's Comment (a) to La. Code Civ. Proc. Ann., Art. 3571. The necessity of showing such "power" is not irrelevant, because the vendor's privilege will not lie against goods not within the "power" of the debtor. Margolin, Civil Law, Vendor's Privilege, 4 Tul. L. Rev. 239 (1930); H. Daggett, On Louisiana Privileges and Chattel Mortgages § 51 (1942).

case arose, the clear showing required must be made to a judge,[5] and the writ will issue only upon his authorization and only after the creditor seeking the writ has filed a sufficient bond[6] to protect the vendee against all damages in the event the sequestration is shown to have been improvident.[7]   Arts. 3501 and 3574.

The writ is obtainable on the creditor's *ex parte* application, without notice to the debtor or opportunity for a hearing, but the statute entitles the debtor immediately to seek dissolution of the writ, which must be ordered unless the creditor "proves the grounds upon which the writ was issued," Art. 3506, the existence of the debt, lien, and delinquency, failing which the court may order return of the property and assess damages in favor of the debtor, including attorney's fees.[8]

---

[5] Articles 282 and 283 of the Code provide, generally, that the court clerk may issue writs of sequestration.   But Art. 281 confines the authority to the judge in Orleans Parish.   There is no dispute in this case that judicial authority for the writ was required and that it was obtained as the statute requires.   The validity of procedures obtaining in areas outside Orleans Parish is not at issue.

[6] As previously noted, the judgment prayed for in this case was in the amount of $574.17.   Grant was ordered to furnish security in the amount of $1,125.

[7] When a writ is issued by the judge, it is served upon the debtor by the sheriff, Art. 3504, who thereafter becomes responsible for the property's safekeeping.   See Johnson, Attachment and Sequestration: Provisional Remedies Under the Louisiana Code of Civil Procedure, 38 Tul. L. Rev. 1, 21–22 (1963).   The plaintiff-creditor, however, see Art. 3576, may himself take possession of the goods if the defendant within 10 days does not secure possession of the goods by posting his own bond as permitted by Art. 3507, but he has no right to sell the goods until final judgment on the merits.   Art. 3510.

[8] Damages would compensate for the period during which the buyer was deprived of the use of the property, but are not restricted to pecuniary loss.   They may encompass injury to social standing or reputation as well as humiliation and mortification.   Johnson, *supra*, n. 7, at 28.

The debtor, with or without moving to dissolve the sequestration, may also regain possession by filing his own bond to protect the creditor against interim damage to him should he ultimately win his case and have judgment against the debtor for the unpaid balance of the purchase price which was the object of the suit and of the sequestration. Arts. 3507 and 3508.[9]

In our view, this statutory procedure effects a constitutional accommodation of the conflicting interests of the parties. We cannot accept petitioner's broad assertion that the Due Process Clause of the Fourteenth Amendment guaranteed to him the use and possession of the goods until all issues in the case were judicially resolved after full adversary proceedings had been completed. It is certainly clear under this Court's precedents that issues can be limited in actions for possession. Indeed, in *Grant Timber & Mfg. Co.* v. *Gray,* 236 U. S. 133 (1915) (Holmes, J.), the Court upheld such limitations in possessory actions for real property in Louisiana. See also *Bianchi* v. *Morales,* 262 U. S. 170 (1923); *Lindsey* v. *Normet,* 405 U. S. 56 (1972). Petitioner's claim must accordingly be narrowed to one for a hearing on the issues in the possessory action—default, the existence of a lien, and possession of the debtor—before property is taken.

As to this claim, the seller here, with a vendor's lien to secure payment of the unpaid balance of purchase price, had the right either to be paid in accordance with its contract or to have possession of the goods for the purpose of foreclosing its lien and recovering the unpaid balance. By complaint and affidavit, the seller swore

---

[9] The debtor's bond necessary to repossess the property "shall exceed by one-fourth the value of the property as determined by the court, or shall exceed by one-fourth the amount of the claim, whichever is the lesser." Art. 3508.

to facts that would entitle it to immediate possession of the goods under its contract, undiminished in value by further deterioration through use of the property by the buyer. Wholly aside from whether the buyer, with possession and power over the property, will destroy or make away with the goods, the buyer in possession of consumer goods will undeniably put the property to its intended use, and the resale value of the merchandise will steadily decline as it is used over a period of time. Any installment seller anticipates as much, but he is normally protected because the buyer's installment payments keep pace with the deterioration in value of the security. Clearly, if payments cease and possession and use by the buyer continue, the seller's interest in the property as security is steadily and irretrievably eroded until the time at which the full hearing is held.

The State of Louisiana was entitled to recognize this reality and to provide somewhat more protection for the seller. This it did in Orleans Parish by authorizing the sequestration of property by a judge. At the same time, the buyer being deprived of possession, the seller was required to put up a bond to guarantee the buyer against damage or expense, including attorney's fees, in the event the sequestration is shown to be mistaken or otherwise improvident. The buyer is permitted to regain possession by putting up his own bond to protect the seller. Absent that bond, which petitioner did not file in this case, the seller would be unprotected against the inevitable deterioration in the value of his security if the buyer remained in possession pending trial on the merits. The debtor, unlike the creditor, does not stand ready to make the opposing party whole, if his possession, pending a prior hearing, turns out to be wrongful.

Second, there is the real risk that the buyer, with possession and power over the goods, will conceal or

transfer the merchandise to the damage of the seller. This is one of the considerations weighed in the balance by the Louisiana law in permitting initial sequestration of the property. An important factor in this connection is that under Louisiana law, the vendor's lien expires if the buyer transfers possession. It follows that if the vendor is to retain his lien, superior to the rights of other creditors of the buyer, it is imperative when default occurs that the property be sequestered in order to foreclose the possibility that the buyer will sell or otherwise convey the property to third parties against whom the vendor's lien will not survive. The danger of destruction or alienation cannot be guarded against if notice and a hearing before seizure are supplied. The notice itself may furnish a warning to the debtor acting in bad faith.

Third, there is scant support in our cases for the proposition that there must be final judicial determination of the seller's entitlement before the buyer may be even temporarily deprived of possession of the purchased goods. On the contrary, it seems apparent that the seller with his own interest in the disputed merchandise would need to establish in any event only the probability that his case will succeed to warrant the bonded sequestration of the property pending outcome of the suit. Cf. *Bell* v. *Burson,* 402 U. S. 535 (1971); *Ewing* v. *Mytinger & Casselberry,* 339 U. S. 594 (1950). The issue at this stage of the proceeding concerns possession pending trial and turns on the existence of the debt, the lien, and the delinquency. These are ordinarily uncomplicated matters that lend themselves to documentary proof; and we think it comports with due process to permit the initial seizure on sworn *ex parte* documents, followed by the early opportunity to put the creditor to his proof. The nature of the issues at stake minimizes the risk that the

writ will be wrongfully issued by a judge. The potential damages award available, if there is a successful motion to dissolve the writ, as well as the creditor's own interest in avoiding interrupting the transaction, also contributes to minimizing this risk.

Fourth, we remain unconvinced that the impact on the debtor of deprivation of the household goods here in question overrides his inability to make the creditor whole for wrongful possession, the risk of destruction or alienation if notice and a prior hearing are supplied, and the low risk of a wrongful determination of possession through the procedures now employed.

Finally, the debtor may immediately have a full hearing on the matter of possession following the execution of the writ, thus cutting to a bare minimum the time of creditor- or court-supervised possession. The debtor in this case, who did not avail himself of this opportunity, can hardly expect that his argument on the severity of deprivation will carry much weight, and even assuming that there is real impact on the debtor from loss of these goods, pending the hearing on possession, his basic source of income is unimpaired.

The requirements of due process of law "are not technical, nor is any particular form of procedure necessary." *Inland Empire Council* v. *Millis*, 325 U. S. 697, 710 (1945). Due process of law guarantees "no particular form of procedure; it protects substantial rights." *NLRB* v. *Mackay Co.*, 304 U. S. 333, 351 (1938). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 895 (1961); *Stanley* v. *Illinois*, 405 U. S. 645, 650 (1972). Considering the Louisiana procedure as a whole, we are convinced that the State has reached a constitutional accommodation of the respective interests of buyer and seller.

## III

Petitioner asserts that his right to a hearing before his possession is in any way disturbed is nonetheless mandated by a long line of cases in this Court, culminating in *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969), and *Fuentes* v. *Shevin*, 407 U. S. 67 (1972). The pre-*Sniadach* cases are said by petitioner to hold that "the opportunity to be heard must precede any actual deprivation of private property." [10] Their import, however, is not so clear as petitioner would have it: they merely stand for the proposition that a hearing must be had before one is finally deprived of his property and do not deal at all with the need for a pretermination hearing where a full and immediate post-termination hearing is provided. The usual rule has been "[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate." *Phillips* v. *Commissioner*, 283 U. S. 589, 596–597 (1931). See also *Scottish Union & National Ins. Co.* v. *Bowland*, 196 U. S. 611, 632 (1905); *Springer*

---

[10] Petitioner relies particularly on: *Covey* v. *Town of Somers*, 351 U. S. 141 (1956); *New York* v. *New York, N. H. & H. R. Co.*, 344 U. S. 293 (1953); *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306 (1950); *Griffin* v. *Griffin*, 327 U. S. 220 (1946); *Opp Cotton Mills* v. *Administrator*, 312 U. S. 126 (1941); *West Ohio Gas Co.* v. *Pub. Util. Comm'n*, 294 U. S. 63 (1935); *United States* v. *Illinois Central R. Co.*, 291 U. S. 457 (1934); *Southern R. Co.* v. *Virginia*, 290 U. S. 190 (1933); *Goldsmith* v. *Board of Tax Appeals*, 270 U. S. 117 (1926); *Coe* v. *Armour Fertilizer Works*, 237 U. S. 413 (1915); *Londoner* v. *Denver*, 210 U. S. 373 (1908); *Central of Georgia R. Co.* v. *Wright*, 207 U. S. 127 (1907); *Roller* v. *Holly*, 176 U. S. 398 (1900); *Hovey* v. *Elliott*, 167 U. S. 409 (1897); *Scott* v. *McNeal*, 154 U. S. 34 (1894); *Windsor* v. *McVeigh*, 93 U. S. 274 (1876); *Ray* v. *Norseworthy*, 23 Wall. 128 (1875); *Rees* v. *City of Watertown*, 19 Wall. 107 (1874); *Baldwin* v. *Hale*, 1 Wall. 223 (1864). Brief for Petitioner 10–11.

v. *United States,* 102 U. S. 586, 593–594 (1881). This generality sufficed to decide relatively modern cases. For example, in *Ewing* v. *Mytinger & Casselberry,* 339 U. S. 594 (1950), the statute at issue permitted multiple seizures of misbranded articles in commerce " 'when the Administrator has probable cause to believe from facts found, without hearing, by him or any officer or employee of the Agency that the misbranded article . . . would be in a material respect misleading to the injury or damage of the purchaser or consumer.' " *Id.,* at 595–596. The specific seizure challenged, made administratively without prior notice or hearing, concerned a concentrate of alfalfa, watercress, parsley, and synthetic vitamins, combined in a package with mineral tablets. There was no claim or suggestion of any possible threat to health. The sole official claim was that the labeling was misleading to the alleged damage of the purchaser. The Court sustained the *ex parte* seizure saying that "[w]e have repeatedly held that no hearing at the preliminary stage is required by due process so long as the requisite hearing is held before the final administrative order becomes effective." *Id.,* at 598. "It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination." *Id.,* at 599.[11]

---

[11] Conceding that the multiple seizure might cause irreparable damage to a business, the Court responded:

"The impact of the initiation of judicial proceedings is often serious. Take the case of the grand jury. It returns an indictment against a man without a hearing. It does not determine his guilt; it only determines whether there is probable cause to believe he is guilty. But that determination is conclusive on the issue of probable cause. As a result the defendant can be arrested and held for trial. See *Beavers* v. *Henkel,* 194 U. S. 73, 85; *Ex parte United States,* 287 U. S. 241, 250. The impact of an indictment is on the reputation or liberty of a man. The same is true where a prosecutor files an information charging violations of the law. The harm to property

More precisely in point, the Court had unanimously approved prejudgment attachment liens effected by creditors, without notice, hearing, or judicial order, saying that "nothing is more common than to allow parties alleging themselves to be creditors to establish in advance by attachment a lien dependent for its effect upon the result of the suit." "The fact that the execution is issued in the first instance by an agent of the State but not from a Court, followed as it is by personal notice and a right to take the case into court, is a familiar method in Georgia and is open to no objection." *Coffin Bros.* v. *Bennett*, 277 U. S. 29, 31 (1928). To the same effect was the earlier case of *Ownbey* v. *Morgan*, 256 U. S. 94 (1921). Furthermore, based on *Ownbey* and *Coffin*, the Court later sustained the constitutionality of the Maine attachment statute. *McKay* v. *McInnes*, 279 U. S. 820 (1929). In that case, a nonresident of Maine sued in the Maine courts to collect a debt from a resident of the State. As permitted by statute, and as an integral part of instituting the suit, the creditor attached the properties of the defendant, without notice and without judicial process of any kind. In sustaining the procedure, the Maine Supreme Court, 127 Me. 110, 141 A. 699 (1928), described the attachment as designed to create a lien for the creditor at the outset of the litigation. "Its purpose is simply to secure to the creditor the property which the debtor has at the time it is made so that it may be seized and levied upon in satisfaction of the debt after judgment and execution may be obtained." *Id.,*

---

and business can also be incalculable by the mere institution of proceedings. Yet it has never been held that the hand of government must be stayed until the courts have an opportunity to determine whether the government is justified in instituting suit in the courts. Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised." 339 U. S., at 599.

at 115, 141 A., at 702. The attachment was deemed "part of the remedy provided for the collection of the debt," *ibid.*, and represented a practice that "had become fully established in Massachusetts, part of which Maine was at the time of the adoption of the Federal Constitution." *Id.*, at 114, 141 A., at 702. The judgment of the Maine court was affirmed without opinion, citing *Ownbey* and *Coffin.*

In *Sniadach* v. *Family Finance Corp., supra,* it was said that *McKay* and like cases dealt with "[a] procedural rule that may satisfy due process for attachments in general" but one that would not "necessarily satisfy procedural due process in every case," nor one that "gives necessary protection to all property in its modern forms." 395 U. S., at 340. *Sniadach* involved the prejudgment garnishment of wages—"a specialized type of property presenting distinct problems in our economic system." *Ibid.* Because "[t]he leverage of the creditor on the wage earner is enormous" and because "prejudgment garnishment of the Wisconsin type may as a practical matter drive a wage-earning family to the wall," it was held that the Due Process Clause forbade such garnishment absent notice and prior hearing. *Id.*, at 341–342. In *Sniadach,* the Court also observed that garnishment was subject to abuse by creditors without valid claims, a risk minimized by the nature of the security interest here at stake and the protections to the debtor offered by Louisiana procedure. Nor was it apparent in *Sniadach* with what speed the debtor could challenge the validity of the garnishment, and obviously the creditor's claim could not rest on the danger of destruction of wages, the property seized, since their availability to satisfy the debt remained within the power of the debtor who could simply leave his job. The suing creditor in *Sniadach* had no prior interest in the property attached, and the opinion did not purport to govern the typical case of

the installment seller who brings a suit to collect an unpaid balance and who does not seek to attach wages pending the outcome of the suit but to repossess the sold property on which he_had retained a lien to secure the purchase price. This very case soon came before the Court in *Fuentes* v. *Shevin*, where the constitutionality of the Florida and Pennsylvania replevin statutes was at issue. Those statutes permitted the secured installment seller to repossess the goods sold, without notice or hearing and without judicial order or supervision, but with the help of the sheriff operating under a writ issued by the court clerk at the behest of the seller. Because carried out without notice or opportunity for hearing and without judicial participation, this kind of seizure was held violative of the Due Process Clause. This holding is the mainstay of petitioner's submission here. But we are convinced that *Fuentes* was decided against a factual and legal background sufficiently different from that now before us and that it does not require the invalidation of the Louisiana sequestration statute, either on its face or as applied in this case.

The Florida law under examination in *Fuentes* authorized repossession of the sold goods without judicial order, approval, or participation. A writ of replevin was employed, but it was issued by the court clerk. As the Florida law was perceived by this Court, "[t]here is no requirement that the applicant make a convincing showing before the seizure," 407 U. S., at 73–74; the law required only "the bare assertion of the party seeking the writ that he is entitled to one" as a condition to the clerk's issuance of the writ. *Id.*, at 74. The Court also said that under the statute the defendant-buyer would "eventually" have an opportunity for a hearing, "as the defendant in the trial of the court action for repossession . . . ." *Id.*, at 75. The Pennsylvania law was considered to be essentially the same as that

of Florida except that it did "not require that there *ever* be opportunity for a hearing on the merits of the conflicting claims to possession of the replevied property." *Id.*, at 77. The party seeking the writ was not obliged to initiate a court action for repossession, was not required formally to allege that he was entitled to the property and had only to file an affidavit of the value of the property sought to be replevied. The Court distinguished the Pennsylvania and Florida procedures from that of the common law where, the Court said, "a state official made at least a summary determination of the relative rights of the disputing parties before stepping into the dispute and taking goods from one of them." *Id.*, at 80.

The Louisiana sequestration statute followed in this case mandates a considerably different procedure. A writ of sequestration is available to a mortgage or lien holder to forestall waste or alienation of the property, but, different from the Florida and Pennsylvania systems, bare, conclusory claims of ownership or lien will not suffice under the Louisiana statute. Article 3501 authorizes the writ "only when the nature of the claim and the amount thereof, if any, and the grounds relied upon for the issuance of the writ clearly appear from specific facts" shown by verified petition or affidavit. Moreover, in the parish where this case arose, the requisite showing must be made to a judge, and judicial authorization obtained. Mitchell was not at the unsupervised mercy of the creditor and court functionaries. The Louisiana law provides for judicial control of the process from beginning to end.[12] This control is one of the measures

<hr>

[12] The approval of a writ of sequestration is not, as petitioner contends, a mere ministerial act. "Since a writ of sequestration issues without a hearing, specific facts as to the grounds relied upon for issuance must be contained in the verified petition in order that the issuing judge can properly evaluate the grounds." *Wright* v.

- adopted by the State to minimize the risk that the *ex parte* procedure will lead to a wrongful taking. It is buttressed by the provision that should the writ be dissolved there are "damages for the wrongful issuance of a writ" and for attorney's fees "whether the writ is dissolved on motion or after trial on the merits." Art. 3506.

The risk of wrongful use of the procedure must also be judged in the context of the issues which are to be determined at that proceeding. In Florida and Pennsylvania property was only to be replevied in accord with state policy if it had been "wrongfully detained." This broad "fault" standard is inherently subject to factual determination and adversarial input. As in *Bell* v. *Burson*, where a driver's license was suspended without a prior hearing, when the suspension was premised on a fault standard, see *Vlandis* v. *Kline*, 412. U. S. 441, 446–447 (1973); in *Fuentes* this fault standard for replevin was thought ill-suited for preliminary *ex parte* determination. In Louisiana, on the other hand, the facts relevant to obtaining a writ of sequestration are narrowly confined. As we have indicated, docu-

---

*Hughes,* 254 So. 2d 293, 296–297 (La. Ct. App. 1971) (on rehearing). To the same. effect is *Hancock Bank* v. *Alexander,* 256 La. 643, 237 So. 2d 669 (1970), where the court held that a simple allegation of indebtedness for money due on an automobile, where no deed of trust was referred to or produced, did not satisfy the "specific facts" test. The court stated:

"*Strict application* of the rules established for the issuance of conservatory writs has been uniformly required by the Courts in the past. It is implicit in those remedies that they should not be availed of unless the conditions which permit them exist; that is to say, it is a prerequisite to their issuance that proper grounds be alleged and sworn to." *Id.,* at 653–654, 237 So. 2d, at 672. (Emphasis added.) *Zion Mercantile Co.* v. *Pierce,* 163 La. 477, 112 So. 371 (1927), upon which petitioner relies, is not to the contrary. The Louisiana court merely held there that it is not necessary to "file" papers requesting the writ with the clerk, or pay court costs, before the judge is empowered to issue the writ.

mentary proof is particularly suited for questions of the existence of a vendor's lien and the issue of default. There is thus far less danger here that the seizure will be mistaken and a corresponding decrease in the utility of an adversary hearing which will be immediately available in any event.

Of course, as in *Fuentes*, consideration of the impact on the debtor remains. Under Louisiana procedure, however, the debtor, Mitchell, was not left in limbo to await a hearing that might or might not "eventually" occur, as the debtors were under the statutory schemes before the Court in *Fuentes*. Louisiana law expressly provides for an immediate hearing and dissolution of the writ "unless the plaintiff proves the grounds upon which the writ was issued." Art. 3506.

To summarize, the Louisiana system seeks to minimize the risk of error of a wrongful interim possession by the creditor. The system protects the debtor's interest in every conceivable way, except allowing him to have the property to start with, and this is done in pursuit of what we deem an acceptable arrangement *pendente lite* to put the property in the possession of the party who furnishes protection against loss or damage to the other pending trial on the merits.

The Court must be sensitive to the possible consequences, already foreseen in antiquity, of invalidating this state statute. Doing so might not increase private violence, but self-help repossession could easily lessen protections for the debtor. See, for example, *Adams v. Southern California First National Bank*, 492 F. 2d 324 (CA9 1973).[13] Here, the initial hardship to the debtor

---

[13] The advisability of requiring prior notice and hearing before repossession has been under study for several years. A number of possibilities have been put forward to modify summary creditor

is limited, the seller has a strong interest, the process proceeds under judicial supervision and management, and the prevailing party is protected against all loss.   Our conclusion is that the Louisiana standards regulating the use of the writ of sequestration are constitutional.   Mitchell

---

remedies, whether taken through some form of court process or effected by self-help under Art. 9 of the Uniform Commercial Code, § 9–503.   Influenced by *Sniadach*, and providing preseizure notice and hearing, are two model acts drafted by the National Consumer Law Center: National Consumer Act §§ 5.206–5.208 (1970), and Model Consumer Credit Act § 7.205 (1973).   Other similar reforms are reflected in the Report of the National Commission on Consumer Finance, Consumer Credit in the United States 30–31 (1972); the Wisconsin Consumer Act, Wis. Stat. Ann. §§ 421.101–427.105 (special pamphlet 1973); and the amendments to the Illinois Replevin Statute, Public Act 78–287, Ill. Laws 1973.   Looking in the other direction and leaving summary procedures intact for the most part are the National Conference of Commissioners on Uniform State Laws, Committee on Uniform Consumer Credit Code, Uniform Consumer Credit Code, Working Redraft No. 5, Nov. 1973, §§ 5.110, 5.112; and the Permanent Editorial Board for the Uniform Commercial Code, Review Committee for Art. 9 of the Uniform Commercial Code, Final Report, § 9–503 (Apr. 25, 1971), together with revised Art. 9 of the U. C. C., 1972 Official Text and Comments, § 9–503.

As revealed in the various studies and proposals, the principal question yet to be satisfactorily answered is the impact of prior notice and hearing on the price of credit, and, more particularly, of the mix of procedural requirements necessary to minimize the cost. The commentators are in the throes of debate, see, *e. g.*, Symposium, Creditors' Rights, 47 S. Cal. L. Rev. 1–164 (1973), and basic questions remain unanswered.   See generally Note, Self-Help Repossession; the Constitutional Attack, the Legislative Response, and the Economic Implications, 62 Geo. L. J. 273 (1973).

We indicate no view whatsoever on the desirability of one or more of the proposed reforms.   The uncertainty evident in the current debate suggests caution in the adoption of an inflexible constitutional rule.   Our holding in this case is limited to the constitutionality of the Louisiana sequestration procedures.

was not deprived of procedural due process in this case.[14] The judgment of the Supreme Court of Louisiana is affirmed.

*So ordered.*

## APPENDIX TO OPINION OF THE COURT

### STATUTES

### PROVISIONS OF THE LOUISIANA CODE OF CIVIL PROCEDURE

Art. 281.   Certain articles not applicable to Civil District Court for the Parish of Orleans

The provisions of Articles 282 through 286 do not apply to the clerk and the deputy clerks of the Civil District Court for the Parish of Orleans.

Art. 282.   Acts which may be done by district court clerk

The clerk of a district court may:

(1) Grant an appeal and fix the return day thereof; fix the amount of the bond for an appeal, or for the issuance of a writ of attachment or of sequestration, or for the release of property seized under any writ, unless fixed by law; appoint an attorney at law to represent a nonresident, absent, incompetent, or unrepresented defendant; or dismiss without prejudice, on application of plaintiff, an action or proceeding in which no exception, answer, or intervention has been filed; and . . . .

---

[14] We are advised by counsel for petitioner of a tide of cases following *Fuentes* and are cautioned that affirmance in this case would set off a riptide with considerable consequences. We perceive no such result. Our decision will not affect recent cases dealing with garnishment or summary self-help remedies of secured creditors or landlords. Nor is it at all clear, with an exception or two, that the reported cases invalidating replevin or similar statutes, dealt with situations where there was judicial supervision of seizure or foreclosure from the outset.

Art. 283.   Orders and judgments which may be signed
by district court clerk

(2) An order for the issuance of executory process,
of a writ of attachment or of sequestration, or of gar-
nishment process under a writ of fieri facias, attachment,
or of sequestration; the release under bond of property
seized under a writ of attachment or of sequestration;
or to permit the filing of an intervention . . . .

Art. 325.  Right of entry for execution; may require
assistance of others if resistance offered or threatened

In the execution of a writ, mandate, order, or judgment
of a court, the sheriff may enter on the lands, and into
the residence or other building, owned or occupied by the
judgment debtor or defendant. . . .

Art. 2373.   Distribution of proceeds of sale

After deducting the costs, the sheriff shall first pay the
amount due the seizing creditor, then the inferior mort-
gages, liens, and privileges on the property sold, and shall
pay to the debtor whatever surplus may remain.

Art. 3501.   Petition; affidavit; security

A writ of attachment or of sequestration shall issue
only when the nature of the claim and the amount
thereof, if any, and the grounds relied upon for the
issuance of the writ clearly appear from specific facts
shown by the petition verified by, or by the separate
affidavit of, the petitioner, his counsel or agent.

The applicant shall furnish security as required by
law for the payment of the damages the defendant may
sustain when the writ is obtained wrongfully.

Art. 3504.   Return of sheriff; inventory

The sheriff, after executing a writ of attachment or of
sequestration, shall deliver to the clerk of the court from

which the writ issued a written return stating the manner in which he executed the writ. He shall annex to the return an inventory of the property seized.

Art. 3506. Dissolution of writ; damages

The defendant by contradictory motion may obtain the dissolution of a writ of attachment or of sequestration, unless the plaintiff proves the grounds upon which the writ was issued. If the writ of attachment or of sequestration is dissolved, the action shall then proceed as if no writ had been issued.

.The court may allow damages for the wrongful issuance of a writ of attachment or of sequestration on a motion to dissolve, or on a reconventional demand. Attorney's fees for the services rendered in connection with the dissolution of the writ may be included as an element of damages whether the writ is dissolved on motion or after trial on the merits.

Art. 3507. Release of property by defendant; security

A defendant may obtain the release of the property seized under a writ of attachment or of sequestration by furnishing security for the satisfaction of any judgment which may be rendered against him.

Art. 3508. Amount of security for release of attached or sequestered property

The security for the release of property seized under a writ of attachment or of sequestration shall exceed by one-fourth the value of the property as determined by the court, or shall exceed by one-fourth the amount of the claim, whichever is the lesser.

Art. 3510. Necessity for judgment and execution

Except as provided in Article 3513 [perishables], a final judgment must be obtained in an action where a writ of attachment or of sequestration has issued before the property seized can be sold to satisfy the claim.

### Art. 3571. Grounds for sequestration

When one claims the ownership or right to possession of property, or a mortgage, lien, or privilege thereon, he may have the property seized under a writ of sequestration, if it is within the power of the defendant to conceal, dispose of, or waste the property or the revenues therefrom, or remove the property from the parish, during the pendency of the action.

### Art. 3574. Plaintiff's security

An applicant for a writ of sequestration shall furnish security for an amount determined by the court to be sufficient to protect the defendant against any damage resulting from a wrongful issuance, unless security is dispensed with by law.

### Art. 3576. Release of property under sequestration

If the defendant does not effect the release of property seized under a writ of sequestration, as permitted by Article 3507, within ten days of the seizure, the plaintiff may effect the release thereof by furnishing the security required by Article 3508.

MR. JUSTICE POWELL, concurring.

In sweeping language, *Fuentes v. Shevin,* 407 U. S. 67 (1972), enunciated the principle that the constitutional guarantee of procedural due process requires an adversary hearing before an individual may be temporarily deprived of any possessory interest in tangible personal property, however brief the dispossession and however slight his monetary interest in the property. The Court's decision today withdraws significantly from the full reach of that principle, and to this extent I think it fair to say that the *Fuentes* opinion is overruled.

I could have agreed that the Florida and Pennsylvania statutes in *Fuentes* were violative of due process be-

cause of their arbitrary and unreasonable provisions. It seems to me, however, that it was unnecessary for the *Fuentes* opinion to have adopted so broad and inflexible a rule, especially one that considerably altered settled law with respect to commercial transactions and basic creditor-debtor understandings. Narrower grounds existed for invalidating the replevin statutes in that case.

I

The constitutional guarantee of procedural due process applies to governmental deprivation of a legitimate "property" or "liberty" interest within the meaning of the Fifth or Fourteenth Amendment. It requires that any such deprivation be accompanied by minimum procedural safeguards, including some form of notice and a hearing. *Arnett* v. *Kennedy, ante,* p. 164 (separate opinion of POWELL, J.); *Board of Regents* v. *Roth,* 408 U. S. 564 (1972); *Perry* v. *Sindermann,* 408 U. S. 593 (1972). In the present case, there can be no doubt that under state law both petitioner and respondent had property interests in the goods sought to be sequestered. Petitioner, as the vendee-debtor under an installment sales contract, had both title and possession of the goods subject to his contractual obligation to continue the installment payments. Respondent, as the vendor-creditor, had a vendor's lien on the goods as security for the unpaid balance.

The determination of what due process requires in a given context depends on a consideration of both the nature of the governmental function involved and the private interests affected. *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961); *Goldberg* v. *Kelly,* 397 U. S. 254, 263–266 (1970). The governmental function in the instant case is to provide a reasonable and fair framework of rules which facilitate commercial transactions on a

credit basis. The Louisiana sequestration statute is designed to protect the legitimate interests of both creditor and debtor. As to the creditor, there is the obvious risk that a defaulting debtor may conceal, destroy, or further encumber the goods and thus deprive the creditor of his security. This danger is particularly acute where, as here, the vendor's lien may be vitiated merely by transferring the goods from the debtor's possession. In addition, the debtor's continued use of the goods diminishes their resale value. In these circumstances, a requirement of notice and an adversary hearing *before* sequestration would impose a serious risk that a creditor could be deprived of his security.

Against this concern must be balanced the debtor's real interest in uninterrupted possession of the goods, especially if the sequestration proves to be unjustified. To be sure, repossession of certain items of personal property, even for a brief period, may cause significant inconvenience. But it can hardly be said that temporary deprivation of such property would necessarily place a debtor in a "brutal need" situation. *Goldberg* v. *Kelly, supra; Arnett* v. *Kennedy, supra.*

In my view, the constitutional guarantee of procedural due process is fully satisfied in cases of this kind where state law requires, as a precondition to invoking the State's aid to sequester property of a defaulting debtor, that the creditor furnish adequate security and make a specific factual showing before a neutral officer or magistrate of probable cause to believe that he is entitled to the relief requested. An opportunity for an adversary hearing must then be accorded promptly after sequestration to determine the merits of the controversy, with the burden of proof on the creditor.

The Louisiana statute *sub judice* satisfies these requirements and differs materially from the Florida and

Pennsylvania statutes in *Fuentes*.[1] Those statutes did not require an applicant for a writ of replevin to make any factually convincing showing that the property was wrongfully detained or that he was entitled to the writ. Moreover, the Florida statute provided only that a post-seizure hearing be held eventually on the merits of the competing claims, and it required the debtor to initiate that proceeding. The Pennsylvania statute made no provision for a hearing at any time.

By contrast, the Louisiana statute applicable in Orleans Parish authorizes issuance of a writ of sequestration "only when the nature of the claim and the amount thereof, if any, and the grounds relied upon . . . clearly appear from specific facts shown by the petition verified by, or by the separate affidavit of, the petitioner, his counsel or agent." La. Code Civ. Proc. Ann., Art. 3501 (1961). The Louisiana statute also provides for an immediate hearing, and the writ is dissolved "unless the

---

[1] The Court outlined the deficiencies of the statutes in *Fuentes*: "There is [under the Florida statute] no requirement that the applicant make a convincing showing before the seizure that the goods are, 'in fact, 'wrongfully detained.' Rather, Florida law automatically relies on the *bare* assertion of the party seeking the writ that he is entitled to one and allows a court clerk to issue the writ summarily. It requires only that the applicant file a complaint, initiating a court action for repossession and reciting in conclusory fashion that he is 'lawfully entitled to the possession' of the property, and that he file a security bond . . . ." 407 U. S., at 73–74 (emphasis added).

The Court noted that the Pennsylvania statute required even less than the Florida statute, since the party seeking the writ "need not even formally allege that he is lawfully entitled to the property." *Id.*, at 78. All that was required was the filing of an " 'affidavit of the value of the property to be replevied.' " *Ibid.* Moreover, the Pennsylvania law did "not require that there ever be opportunity for a hearing on the merits of the conflicting claims to possession of the replevied property." *Id.*, at 77.

[creditor] proves the grounds upon which the writ was issued." Art. 3506.

The Court's opinion makes these points well, and I need not elaborate them further. In brief, the Louisiana statute satisfies the essential prerequisites of procedural due process and represents a fairer balancing of the interests of the respective parties than the statutes in *Fuentes.* I therefore agree that the Louisiana procedure should be sustained against petitioner's challenge.

## II

MR. JUSTICE STEWART reproves the Court for not adhering strictly to the doctrine of *stare decisis. Post,* at 634–636. To be sure, *stare decisis* promotes the important considerations of consistency and predictability in judicial decisions and represents a wise and appropriate policy in most instances. But that doctrine has never been thought to stand as an absolute bar to reconsideration of a prior decision, especially with respect to matters of constitutional interpretation.[2] Where the Court errs in its construction of a statute, correction may always be accomplished by legislative action. Revision of a constitutional interpretation, on the other hand, is often impossible as a practical matter, for it requires the cumbersome route of constitutional amendment. It is thus not only our prerogative but also our duty to re-examine a precedent where its reasoning or understanding of the Constitution is fairly called into

---

[2] See *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 93 (1936) (Stone and Cardozo, JJ., concurring in result); *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 405, 406–408 (1932) (Brandeis, J., dissenting). For the view that *stare decisis* need not always apply even to questions of statutory interpretation, see *Boys Markets* v. *Retail Clerks Union,* 398 U. S. 235, 255 (1970) (Stewart, J., concurring).

question. And if the precedent or its rationale is of doubtful validity, then it should not stand. As Mr. Chief Justice Taney commented more than a century ago, a constitutional decision of this Court should be "always open to discussion when it is supposed to have been founded in error, [so] that [our] judicial authority should hereafter depend altogether on the force of the reasoning by which it is supported." *Passenger Cases,* 7 How. 283, 470 (1849).

Moreover, reconsideration is particularly appropriate in the present case. To the extent that the *Fuentes* opinion established a Procrustean rule of a prior adversary hearing, it marked a significant departure from past teachings as to the meaning of due process.[3] As the Court stated in *Cafeteria Workers* v. *McElroy,* 367 U. S., at 895, "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." The *Fuentes* opinion not only eviscerated that principle but also sounded a potential death knell for a panoply of statutes in the com-

---

[3] The *Fuentes* opinion relied primarily on *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337 (1969). That case involved a prejudgment garnishment of wages in which the creditor had no pre-existing property interest. It is readily distinguishable from the instant case where the creditor does have a pre-existing property interest as a result of the vendor's lien which attached upon execution of the installment sales contract. Indeed, depending on the number of installments which have been paid, the creditor's interest may often be greater than the debtor's. Thus, we deal here with mutual property interests, both of which are entitled to be safeguarded. *Fuentes* overlooked this vital point.

In addition, the Court recognized in *Sniadach* that prejudgment garnishment of wages could as a practical matter "impose tremendous hardship" and "drive a wage-earning family to the wall." *Id.,* at 340, 341–342. By contrast, there is no basis for assuming that sequestration of a debtor's goods would necessarily place him in such a "brutal need" situation.

mercial field.[4]   This fact alone justifies a re-examination of its premises.   The Court today reviews these at length, and I join its opinion because I think it represents a re-affirmation of the traditional meaning of procedural due process.

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUG-LAS and MR. JUSTICE MARSHALL concur, dissenting.

The Louisiana sequestration procedure now before us is remarkably similar to the statutory provisions at issue in *Fuentes* v. *Shevin*, 407 U. S. 67 (1972).   In both cases the purchaser-in-possession of the property is not afforded any prior notice of the seizure or any opportunity to rebut the allegations of the vendor before the property is summarily taken from him by agents of the State.   In both cases all that is required to support the issuance of the writ and seizure of the goods is the filing of a complaint and an affidavit containing *pro forma* allegations in support of the seller's purported entitlement to the goods in question.   Since the procedure in both cases is completely *ex parte,* the state official charged with issuing the writ can do little more than determine the formal sufficiency of the plaintiff's allegations before ordering the state agents to take the goods from the defendant's possession.[1]

---

[4] For a discussion of the far-reaching implications of the *Fuentes* rationale, see Clark & Landers, *Sniadach, Fuentes* and *Beyond: The Creditor Meets the Constitution*, 59 Va. L. Rev. 335 (1973). The authors suggest that *Fuentes* could require invalidation of many summary creditor remedies in their present form.

[1] The Louisiana Supreme Court held that *Fuentes* did not govern the present case.   Essentially, that court held that because the Louisiana vendor's privilege is defeated if the vendee alienates the property over which the vendor has the privilege, this case falls within the language in *Fuentes* that "[t]here may be cases in which a creditor could make a showing of immediate danger that a debtor

The question before the Court in *Fuentes* was what procedures are required by the Due Process Clause of the Fourteenth Amendment when a State, at the behest of a private claimant, seizes goods in the possession of another, pending judicial resolution of the claimant's assertion of superior right to possess the property. The Court's analysis of this question began with the proposition that, except in exceptional circumstances,[2] the deprivation of a property interest encompassed within the Fourteenth Amendment's protection must be preceded by notice to the affected party and an opportunity to be heard. The Court then went on to hold that a debtor-vendee's interest in the continued possession of purchased goods was "property" within the Fourteenth Amendment's protection and that the "temporary, nonfinal deprivation of [this] property [is] . . . a 'deprivation' in the terms of the Fourteenth Amendment." 407 U. S., at 85. Accordingly, *Fuentes* held that such a deprivation of property must be preceded by notice to the possessor and by an opportunity for a hearing appropriate under the circumstances. Matters such as

---

will destroy or conceal disputed goods." *Fuentes* v. *Shevin,* 407 U. S. 67, 93 (1972). The Court today quite correctly does not embrace this rationale. In discussing the " 'extraordinary situations' " that might justify the summary seizure of goods, the *Fuentes* opinion stressed that these situations "must be truly unusual." *Id.,* at 90. Specifically, it referred to "special situations demanding prompt action." *Id.,* at 93. In effect, the Louisiana Supreme Court held that *all* vendor-creditors in the State can be conclusively presumed to be in this "special" situation, regardless of whether the individual vendor could make a showing of immediate danger in his particular case. But if the situation of all such vendors in a State could be conclusively presumed to meet the "extraordinary," "unusual," and "special" conditions referred to in *Fuentes,* the basic constitutional rule of that case would be wholly obliterated in the State.

[2] 407 U. S., at 90–93.

requirements for the posting of bond and the filing of sworn factual allegations, the length and severity of the deprivation, the relative simplicity of the issues underlying the creditor's claim to possession, and the comparative "importance" or "necessity" of the goods involved were held to be relevant to determining the form of notice and hearing to be provided, but not to the constitutional need for notice and an opportunity for a hearing of some kind.

The deprivation of property in this case is identical to that at issue in *Fuentes,* and the Court does not say otherwise. Thus, under *Fuentes,* due process of law permits Louisiana to effect this deprivation only after notice to the possessor and opportunity for a hearing. Because I would adhere to the holding of *Fuentes,* I dissent from the Court's opinion and judgment upholding Louisiana's *ex parte* sequestration procedure, which provides that the possessor of the property shall never have advance notice or a hearing of any kind.

As already noted, the deprivation of property in this case is identical to that in *Fuentes.* But the Court says that this is a different case for three reasons: (1) the plaintiff who seeks the seizure of the property must file an affidavit stating "specific facts" that justify the sequestration; (2) the state official who issues the writ of sequestration is a judge instead of a clerk of the court; and (3) the issues that govern the plaintiff's right to sequestration are limited to "the existence of a vendor's lien and the issue of default," and "[t]here is thus far less danger here that the seizure will be mistaken and a corresponding decrease in the utility of an adversary hearing," *ante,* at 618. The Court's opinion in *Fuentes,* however, explicitly rejected each of these factors as a ground for a difference in decision.

The first two purported distinctions relate solely to

the procedure by which the creditor-vendor secures the State's aid in summarily taking goods from the purchaser's possession. But so long as the Louisiana law routinely permits an *ex parte* seizure without notice to the purchaser, these procedural distinctions make no constitutional difference.

The Louisiana affidavit requirement can be met by any plaintiff who fills in the blanks on the appropriate form documents and presents the completed forms to the court. Although the standardized form in this case called for somewhat more information than that required by the Florida and Pennsylvania statutes challenged in *Fuentes*, such *ex parte* allegations "are hardly a substitute for a prior hearing, for they test no more than the strength of the applicant's own belief in his rights. Since his private gain is at stake, the danger is all too great that his confidence in his cause will be misplaced. Lawyers and judges are familiar with the phenomenon of a party mistakenly but firmly convinced that his view of the facts and law will prevail, and therefore quite willing to risk the costs of litigation." 407 U. S., at 83.

Similarly, the fact that the official who signs the writ after the *ex parte* application is a judge instead of a court clerk is of no constitutional significance. Outside Orleans Parish, this same function is performed by the court clerk. There is nothing to suggest that the nature of this duty was at all changed when the law was amended to vest it in a judge rather than a clerk in this one parish. Indeed, the official comments declare that this statutory revision was intended to "mak[e] no change in the law." [3] Whether the issuing functionary be a judge or a court clerk, he can in any event do no more than ascertain the formal sufficiency of the plaintiff's allegations, after

---

[3] La. Code Civ. Proc. Ann., Art. 281 (1961).

which the issuance of the summary writ becomes a simple ministerial act.[4]

The third distinction the Court finds between this case and *Fuentes* is equally insubstantial. The Court says the issues in this case are "particularly suited" to *ex parte* determination, in contrast to the issues in *Fuentes*, which were "inherently subject to factual determination and adversarial input," *ante,* at 617, 618. There is, however, absolutely no support for this purported distinction. In this case the Court states the factual issues as "the existence of a vendor's lien and the issue of default." *Ante,* at 618. The issues upon which replevin depended in *Fuentes* were no different; the creditor-vendor needed only to establish his security interest and the debtor-vendee's default. As MR. JUSTICE WHITE acknowledged in his *Fuentes* dissent, the essential issue at any hearing would be whether "there is reasonable basis for his [the creditor-vendor's] claim of default." 407 U. S., at 99–100. Thus, the Court produces this final attempted distinction out of whole cloth.

Moreover, *Fuentes* held that the relative complexity of the issues in dispute is not relevant to determining whether a prior hearing is required by due process. "The issues decisive of the ultimate right to continued possession, of course, may be quite simple. The simplicity of the issues might be relevant to the formality or scheduling of a prior hearing. But it certainly cannot undercut the right to a prior hearing of some kind." *Id.,* at 87 n. 18 (citation omitted). Similarly, the probability of suc-

---

[4] The Louisiana authorities cited by the Court are not to the contrary. *Wright* v. *Hughes,* 254 So. 2d 293 (La. Ct. App. 1971), and *Hancock Bank* v. *Alexander,* 256 La. 643, 237 So. 2d 669 (1970), stand only for the proposition that a writ should not issue unless the sworn allegations are formally sufficient, which may mean nothing more than that the proper standardized form be completely filled in.

cess on the factual issue does not affect the right to prior notice and an opportunity to be heard.

> "The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing. To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits. It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing on the contractual right to continued possession and use of the goods." *Id.,* at 87 (internal quotation marks and citation omitted).

In short, this case is constitutionally indistinguishable from *Fuentes* v. *Shevin,* and the Court today has simply rejected the reasoning of that case and adopted instead the analysis of the *Fuentes* dissent. In light of all that has been written in *Fuentes* and in this case, it seems pointless to prolong the debate. Suffice it to say that I would reverse the judgment before us because the Louisiana sequestration procedure fails to comport with the requirements of due process of law.

I would add, however, a word of concern. It seems to me that unless we respect the constitutional decisions of this Court, we can hardly expect that others will do so. Cf. *Roofing Wholesale Co.* v. *Palmer,* 108 Ariz. 508, 502 P. 2d 1327 (1972). A substantial departure from precedent can only be justified, I had thought, in the light of experience with the application of the rule to be abandoned or in the light of an altered historic environ-

ment.[5]   Yet the Court today has unmistakably overruled a considered decision of this Court that is barely two years old, without pointing to any change in either societal perceptions or basic constitutional understandings that might justify this total disregard of *stare decisis*.

The *Fuentes* decision was in a direct line of recent cases in this Court that have applied the procedural due process commands of the Fourteenth Amendment to prohibit governmental action that deprives a person of a statutory or contractual property interest with no advance notice or opportunity to be heard.[6]   In the short time that has elapsed since the *Fuentes* case was decided, many state and federal courts have followed it in assessing the constitutional validity of state replevin statutes and other comparable state laws.[7]   No data have been brought to our attention to indicate that these decisions, granting to otherwise defenseless consumers the simple rudiments of due process of law, have worked any untoward change in the consumer credit market or in other commercial relationships.   The only perceivable change that has occurred since *Fuentes* is in the makeup of this Court.[8]

---

[5] See, *e. g., North Dakota Board of Pharmacy* v. *Snyder's Drug Stores,* 414 U. S. 156 (1973); *Brown* v. *Board of Education,* 347 U. S. 483 (1954).

[6] See, *e. g., Goldberg* v. *Kelly,* 397 U. S. 254 (1970); *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337 (1969); and *Bell* v. *Burson,* 402 U. S. 535 (1971).

[7] See, *e. g., Turner* v. *Colonial Finance Corp.,* 467 F. 2d 202 (CA5 1972); *Sena* v. *Montoya,* 346 F. Supp. 5 (NM 1972); *Dorsey* v. *Community Stores Corp.,* 346 F. Supp. 103 (ED Wis. 1972); *Thorp Credit, Inc.* v. *Barr,* 200 N. W. 2d 535 (Iowa 1972); *Inter City Motor Sales* v. *Common Pleas Judge,* 42 Mich. App. 112, 201 N. W. 2d 378 (1972); and *Montoya* v. *Blackhurst,* 84 N. M. 91, 500 P. 2d 176 (1972).

[8] Although MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST

A basic change in the law upon a ground no firmer than a change in our membership invites the popular misconception that this institution is little different from the two political branches of the Government. No misconception could do more lasting injury to this Court and to the system of law which it is our abiding mission to serve.

MR. JUSTICE BRENNAN is in agreement that *Fuentes* v. *Shevin*, 407 U. S. 67 (1972), requires reversal of the judgment of the Supreme Court of Louisiana.

---

were Members of the Court at the time that *Fuentes* v. *Shevin* was announced, they were not Members· of the Court when that case was argued, and they did not participate in its "consideration or decision." 407 U. S., at 97.