OPINION OF THE COURT
Kristin Booth Glen, J.
These cases involve six separate applications[1] by Consolidated Edison Co. (Con Ed) for orders of seizure to permit a Marshal to break open, enter and remove the utility meters of customers alleged to be delinquent in their payments. All . were submitted on the default of the named defendants to appear. The cases present questions of first impression as they involve construction of the Home Energy Fair Practices Act[2] which became effective only on October 19,1981. Based on that legislation and the regulations enacted in its furtherance, all six applications must be denied.
TERMINATION PROCEDURE
These applications represent the final stage in the standard procedure used by Con Ed and other utilities to disconnect a customer’s service. The process begins with the mailing of a notice of termination which gives the customer 15 days to pay the overdue bill.[3] When the statutory period passes, Con Ed sends representatives to disconnect the service. If the Con Ed representatives are unable to obtain access to the meter for purposes of termination, a *3 replevin action is begun. Con Ed then mails a “final notice of termination” (via first class and certified mail) in which the customer is advised that the utility has filed an application for an order of seizure. The notice explains that the customer may obtain a hearing by appearing at the office of the Clerk of Special Term within 10 days from the date the notice is served. When the customer fails to appear, either to obtain a hearing or on the date set for the hearing, the utility submits the order of seizure to the court, along with a summons, verified complaint, and affidavit, an undertaking and affidavit of the surety, a copy of the final termination notice with proof of mailing, and a computer print-out which apparently contains billing and payment information about the customer’s account and whose purpose is to verify the amounts claimed to be unpaid.[4] If the Judge presiding at Special Term signs the order, the customer is given seven days’ notice by ordinary mail of the date when the Marshal is to seize the customer’s meter, and thereby terminate service.
REPLEVIN
The statutory basis for the remedy sought by Con Ed is derived from CPLR 7102 which sets forth the requirements for obtaining an order of seizure. Such an order is essentially a quasi-provisional remedy, ancillary to an action for recovery of chattel. (CPLR 7101, 7012, subd [a]; see Sears Roebuck & Co. v Austin, 60 Misc 2d 908.) To obtain an order of seizure, the plaintiff is required to submit an undertaking together with an affidavit which must clearly identify the chattel to be seized and state the following (CPLR 7102, subd [c]):
“1. that the plaintiff is entitled to possession by virtue of facts set forth;
“2. that the chattel is wrongfully held by the defendant named;
*4 “3. whether an action to recover the chattel has been commenced, the defendants served, whether they are in default, and, if they have appeared, where papers may be served upon them;
“4. the value of each chattel or class of chattels claimed, or the aggregate value of all chattels claimed;
“5. if the plaintiff seeks the inclusion in the order of seizure of a provision authorizing the sheriff to break open, enter and search for the chattel, the place where the chattel is located and facts sufficient to establish probable cause to believe that the chattel is located at that place;
“6. that no defense to the claim is known to the plaintiff; and
“7. if the plaintiff seeks an order of seizure without notice, facts sufficient to establish that unless such order is granted without notice, it is probable the chattel will become unavailable for seizure by reason of being transferred, concealed, disposed of, or removed from the state, or will become substantially impaired in value.”
The court may grant the order upon finding it is probable that the plaintiff will succeed on the merits. (CPLR 7102, subd [d].) It is.here that problems abound with the applications submitted by Con Ed. By its terms, the statute requires a finding of probable success on the merits, i.e., that Con Ed is entitled to possession of the meter arid that the meter is being wrongfully held by the customer. To make such á determination the court must consider the laws and regulations applicable to utilities which set down the procedure to be followed for the termination of service, and define the respective rights of the utility and the customer. Only if all the applicable procedures have been followed, and all statutory requirements met, can a determination of probable success be made and the order granted.
PRESENT LAW REGARDING TERMINATION OF SERVICE
In recognition of the importance of energy as a resource which is as essential to life as food, shelter and clothing, the Legislature recently enacted the Home Energy Fair Practices Act (HEFPA or the Act) providing a comprehensive scheme for the protection of utility customers. Effec *5 tive October 19, 1981, the Act imposes several obligations on utilities, requiring them to provide service to residential customers, adopt fair billing and payment procedures, as well as comply with numerous safeguards to prevent the unreasonable termination of residentiál services. Prefaced by a strong statement of legislative purpose, section 30 of the Act declares it: “to be the policy of this state that the continued provision of gas, electric and steam service to residential customers without unreasonable qualifications or lengthy delays is necessary for the preservation of the health and general welfare and is in the public interest.” (L 1981, ch 713, § 3.)
For those living in New York City, the grave consequences that result from the termination of electric services are well known.[5] During the winter months, when heating systems frequently fail, tens of thousands of residents are forced to depend on various types of electric space heaters and ovens to heat their apartments or homes. Last winter the New York City Department of Housing Development and Preservation received 321,000 complaints for lack of heat and hot water. In a building without heat, the termination of utility services poses a direct threat to the health and safety of its occupants. Unfortunately, those most likely to live in substandard housing lacking adequate heat are persons with fixed or low incomes who are also the most frequent victims of utility shut-offs.
In view of the financial plight of such persons, who now face the added hardships imposed by drastic cuts in Federal and State aid, the prospect of widespread health and/or life-threatening utility disconnections may be imminent. Therefore, it is of the utmost importance that the protections the Legislature provided for residential utility customers in the Home Energy Fair Practices Act be rigorously applied.
On October 14, 1981, the Public Service Commission adopted interim rules implementing HEFPA, as required by the Act. (16 NYCRR 11.1-11.22.) These interim rules which have the force of law must also be considered in determining the legality of the instant applications. Ac *6 cordingly, the critical question before the court is whether granting an order for a meter seizure, upon the papers submitted by Con Ed,[6] would violate the provisions of. the Home Energy Fair Practices Act, and the general law of replevin which requires a finding of probable success on the merits.[7] For the reasons discussed below, the answer is clearly yes.
THE STATUTORY REQUIREMENTS
HEFPA, and the implementing rules promulgated by the Public Service Commission impose numerous conditions with which a utility must comply prior to disconnecting a residential customer’s service.[8] These include provisions regarding the final notice of termination; notice to appropriate officials when the customer is a recipient of public assistance; special protections for specific residential customers as well as terminations during cold weather periods; and deferred payment plans. Since a neutral Judge faced with the task of assessing the validity of an order for seizure of a meter must make a determination concerning the utility’s compliance with the above provisions, each of these statutory requirements and/or rules will be discussed briefly.
NOTICE OF TERMINATION
The commission’s rules substantially revise the time frame for service of notice of final termination as well as the contents of the notice. Under the rules a customer’s *7 service may not be shut off sooner than 38 days after billing.[9] The contents of the final notice of termination must include a summary of the protections available under the Act and notice that any customer eligible for such protection should contact the utility, together with the address and telephone number of the office of the utility.[10]
NOTIFICATION OF SOCIAL SERVICES
In conjunction with section 65-b of the Public Service Law (L 1981, ch 895) the commission’s rules require, for any customer the utility knows is receiving or is applying for public assistance, that notice be given to an appropriate social services official five days prior to the termination of the customer’s service.[11]
PROTECTIONS FOR SPECIAL CUSTOMERS
(1) MEDICAL EMERGENCIES
Under the new rules no utility may terminate service to a household where a medical emergency exists. A medical emergency is defined as a serious illness or a medical condition that affects either a customer or a permanent resident of the customer’s household. To qualify for this protection the customer must notify the utility that such an emergency exists and duly submit certification of the condition by a medical doctor or a local board of health.[12]
(2) ELDERLY, BLIND OR DISABLED CUSTOMERS
For customers who are blind, disabled, or over the age of 62, the rules require a utility to make a diligent effort to *8 contact such customers, in person or by telephone, 10 days prior to the termination of service for the purpose of devising a plan to avoid discontinuing the service and arranging for payment. The utility is also required to notify the local Department of Social Services of the intended shut-offs so that social services may assist in developing a plan for such customers.[13]
(3) PROCEDURES DURING COLD WEATHER PERIODS
The new procedures applicable during cold weather months, from November 1 to April 15, require the utilities to identify customers who use the utilities’ services for the purpose of heating their homes, and further establish several safeguards designed to prevent termination of a customer’s service whenever it would pose a likely threat of a serious impairment of the customer’s health or safety. These safeguards include requiring the utilities to make a diligent effort to contact customers, in person or by telephone, 72 hours prior to any intended termination of service to determine if a serious impairment of the customer’s health or safety is likely to result from the termination of service. Upon making such a finding, the rules prohibit the utilities from disconnecting a customer’s service unless the Social Services Commission, after making an independent investigation, concludes that no impairment of health or safety would result from the termination.[14]
DEFERRED PAYMENT PLAN
The final provision of significance here prohibits the utilities from terminating a customer’s service for nonpayment unless they first offer the customer a deferred payment agreement, setting up a schedule of payments which must be fair and equitable considering the customer’s financial circumstances.[15] While neither the statute nor the rules indicate precisely when the schedule must be *9 offered, a fair reading suggests that it must be done at the time of, or prior to, the termination notice.[16]
CONCLUSION
A neutral Judge attempting to assess the validity of an order for the seizure of a meter must make a determination that the order, which effectuates the termination of a customer’s service, complies with the terms of the Home Energy Fair Practices Act. It is clear from the stated purpose of the Act as well as the provisions discussed above, that the utility carries the burden of proving compliance.
A review of the affidavit submitted by Con Ed in these cases reveals that no facts are alleged pertaining to any of the Act’s relevant provisions.[17] By its terms, the Act applies only to residential customers. However, neither the affidavit submitted by Con Ed nor its accompanying papers provide any means of determining whether the defendant customer’s account is residential or commercial. At minimum, the affidavit should explictly state whether the meter to be seized is for a residence or business, and further provide a sufficient statement of facts to enable a Judge to determine whether Con Ed has complied with the rules pertaining to the final notice of termination; notification of social services; medical emergencies; elderly, blind and disabled customers; the procedures during cold weather periods; and whether a deferred payment plan has been offered and, if necessary, reviewed or amended. Without these facts the orders of seizure are facially defective, and accordingly are denied.

. The defendants are Dorothy Jones and Benjamin Barnes who may clearly be presumed to be residential customers; Biagio Bono who may, from the papers submitted, have both residential and commercial accounts; and 8 Christopher Street Corp., Waterfront Restaurant and Ronald Kennard d/b/a Independent Dance, who may be'presumed to be commercial customers.

. Home Energy Fair Practices Act (L 1981, ch 713).

. Prior to October 19, 1981, section 15 of the Transportation Corporations Law, referred to in paragraph 5 of the affidavits submitted in the instant applications, required only a five-day notice. Under HEFPA, a 15-day notice is required.

. This print-out is in fact entirely incomprehensible without a key which is not provided. It is virtually impossible to determine what the charges are for and therefore whether they are permissible or impermissible under HEFPA, whether commercial, residential, or a combination, etc. Section 11.15 of the commission’s rules prohibits the utilities from charging a customer for any collection efforts, service disconnections or deferred payment agreements. The rules also place restrictions on the ability of the utilities to back-bill. (§ 11.14.) As submitted, the computer print-out is entirely conclusory and of no evidentiary value.

. For example, last year a five-year-old girl died as a result of the disconnection of the electricity in her home. (Daily News, Dec. 19, 1980, p C5.)

. Additionally, the “acceptance of undertaking” included in the application is factually defective for failure to provide adequate financial information as discussed in the recent thoughtful opinion of Judge Edward Lehner in Consolidated Edison Co. of N. Y. v Alston (110 Misc 2d 188).

. Because of the many statutory violations present here, it is neither necessary nor appropriate to consider the legality of the entire replevin procedure, although that procedure raises serious constitutional questions. (See, e.g., Montalvo v Consolidated Edison Co. of N. Y., 110 Misc 2d 24.)

. By its terms, of course, HEFPA is applicable only to residential customers. As discussed below, however, it is impossible to determine, on the affidavits and material submitted by Con Ed, whether the defendants here are covered residential or unprotected commercial customers. While a court may surmise, based on the defendant’s name, such surmise is, by itself, impermissible basis for denying the protections of HEFPA to any utitility customer, given the public policy consideration of the Act.

. This time period is set forth in two separate provisions. (§ 11.4 [c] [1], [2].) One requires that the final notice of termination be sent no less than 15 days before the termination date shown on the notice. The other prohibits issuance of the final notice of termination until 20 days, or 23 days if the bill is mailed, after the date payment was due to the utility.

. The complete list of revisions is contained in section 11.4 (b).

. In a provision, separate from the “HEFPA”, the Public Service Law was amended to require that: “No gas corporation, electric corporation or municipality shall refuse to supply or to continue to supply utility services to any person who has applied for or is receiving public assistance, supplemental security income benefits, or additional state payments pursuant to the social services law, solely on the grounds that there may be money due to the utility corporation or municipality for services previously furnished to such person, if the utility corporation or municipality receives, or is entitled to receive, a direct payment or receives a guarantee of payment from a social services district.” (Public Service Law, § 65-b, as added by L 1981, ch 895.) The notice provision and other protections extended to welfare recipients by the rules promulgated under the HEFPA are contained in section 11.4 (h). (16 NYCRR 11.4 [h].)

. The details of the certification procedure are set forth in section 11.5 (a) of the new rules. (16 NYCRR 11.5 [a].)

. The complete safeguards provided for the elderly, blind and disabled can be found in section 11.5 (b) of the commission’s rules. (16 NYCRR 11.5 [b].)

. The procedures relating to cold weather periods are contained in section 11.5 (c) of the rules. (16 NYCRR 11.5 [c].)

. The rules regarding the terms of the deferred payment plan are set forth in section 11.10. (16 NYCRR 11.10.)

. This is because according to the statute, termination is permitted if a customer “fails to pay amounts due under a deferred payment plan” (Public Service Law, § 32, subd 2, par [b], as added by L 1981, ch 713). Because of the “financial circumstances” requirement, it would also appear that whatever plan the utility offers the customer should contain a statement that if the customer is unable to make those payments, a conference or other financial review is available to him or her.

. In paragraph 7 of Con Ed’s form affidavit it is alleged that the defendant customer is not a recipient of public assistance. As the new Act and implementing rules apply to residential customers the utility knows is receiving or is entitled to receive public assistance, the allegation contained in the affidavit is insufficient.