OPINION OF THE COURT
Margaret Cammer, J.
These are 4 of approximately 250 applications submitted by Brooklyn Union Gas Company in the midst of the winter season for an order to allow a city marshal to break open, enter and search defendants’ apartments and seize their gas meters. Requested relief is premised on claimed nonpayment by defendants of their utility bills.* All the defendants have defaulted.
*803 The applications are submitted in purported compliance with the terms of a consent agreement dated February 24, 1983 between Con Edison and the New York State Attorney-General, governing such replevin actions. Nevertheless, they raise the question whether, notwithstanding such compliance, these applications present a proper basis to grant an order of seizure. A review of the historical underpinnings of the consent decree and the applicable law governing utility service indicates these applications are fatally and facially flawed.
Replevin is a drastic remedy. When it involves the breaking and entering into someone’s home, especially to remove what is most likely the home’s sole source of heat and cooking fuel, it becomes even more so. Therefore, the courts have been careful to attempt to insure that any requested seizures comport fully with constitutional due process requirements. (See, e.g., LaPrease v Raymours Furniture Co., 315 F Supp 716; Fuentes v Shevin, 407 US 67; Mitchell v Grant Co., 416 US 600; Finkenberg Furniture Corp. v Vasquez, 67 Misc 2d 154; Consolidated Edison Co. v Vezcanino, 77 Misc 2d 475; Brooklyn Union Gas Co. v Gottlieb, 121 Misc 2d 728.)
In 1981, the Legislature manifested its own concerns about protecting the rights of residential utility customers when it enacted the Home Energy Fair Practices Act (HEFPA; Public Service Law, art 2). HEFPA declares it “to be the policy of this state that the continued provision of gas, electric and steam service * * * without unreasonable qualifications or lengthy delays is necessary for the preservation of the health and general welfare and is in the public interest.” (Public Service Law, § 30.) In furtherance of this policy, HEFPA established various rights, duties and responsibilities of utility companies and their customers. These include procedures governing applications for service, termination of service, deferred payment plans, billing procedures, and the handling of complaints. It also directed the Public Service Commission to “adopt such additional rules and regulations as it deems necessary and proper to implement [HEFPA’s] provisions.” (Public Service Law, § 50.) Thus, on April 8, 1982, the Public Service Commission adopted a set of final rules implementing the Home Energy Fair Practices Act (16 NYCRR 11.1-11.22).
*804 As the act declares, its purpose is to insure continued utility service as part of the public weal. The Legislature was particularly concerned that continued utility service-be provided to those suffering from a medical emergency, or who are elderly, blind or disabled, or “who [may] suffer serious impairment to health or safety” as a result of termination of heat related service in cold weather. (Public Service Law, § 32, subd 3.) Thus, for example, a utility must continue to provide service to any customer who has been duly certified by a medical doctor or the local Board of Health as suffering from a medical emergency, despite nonpayment for such service. (Public Service Law, § 32, subd 3, par [a].)
Like safeguards were enacted to protect the elderly, blind and disabled from a cutoff of their utilities. Among other things, a utility must establish procedures for identifying this protected class of customers (Public Service Law, § 32, subd 3, par [b]); it also must “make a diligent effort to contact by telephone, or in person if telephone contact is unsuccessful, an adult resident at the customer’s premises at least 72 hours prior to termination of service for the purpose of devising a plan that would preclude termination and arrange for payment of bills” (16 NYCRR 11.5 [b] [2]) including a deferred payment plan; it also must notify the local Department of Social Services of the customer’s name and address for it to help the customer if no payment plan is possible; and is required to continue to provide service for at least 15 days from the time it makes the referral. (16 NYCRR 11.5 [b] [1], [2].)
So, too, a utility may not terminate heat related service for nonpayment between November 1 and April 15, unless it has made “a diligent effort to contact by telephone or in person an adult resident of the customer’s premises [at] least seventy-two hours prior to termination, makes a personal visit at the time of termination and provides the customer with information regarding the protections available under this article.” (Public Service Law, § 32, subd 3, par [c], cl [i].) The utility must also continue “service to customers where a serious impairment to health or safety is likely to result from termination of service and the person supplied is unable because of men *805 tal or physical problems to manage his or her own resources or to protect himself or herself from neglect or hazardous situations without the assistance of others. Doubts shall be resolved in favor of continued service.” (Public Service Law, § 32, subd 3, par [c], cl [ii].) In sum, the Legislature has evinced an unequivocal concern and has established special procedures to insure the continuation of utility services to particular classes of people, especially during the winter.
After the enactment of this legislation, the then existing requests for orders of seizure were held to be facially defective because they failed to indicate whether the utility had complied with the HEFPA pretermination notice requirements and procedures applicable to medical emergencies, the elderly, blind or disabled, or during the cold weather period. (Consolidated Edison Co. v Jones, 111 Misc 2d 1.)
The New York State Attorney-General then began an inquiry into Con Ed’s practices in replevin actions. “The purpose of the inquiry”, according to the terms of the consent agreement which ensued, “was to determine whether the documentation used by Con Ed and submitted to the Civil Court of the City of New York in the course of its replevin actions complies with the Home Energy Fair Practices Act.”
After his investigation, the Attorney-General determined that “the supporting affidavits submitted by Con Ed failed to allege compliance with [various] HEFPA termination requirements” and that the form of the order of seizure used by Con Edison was equally deficient. The Attorney-General also stated its belief that “Con Ed’s practice of mailing defendants a notice of application for an order of seizure unaccompanied by its supporting affidavit” is violative of due process and the provisions of CPLR 2214 (subd [b]).
On February 24, 1983, Con Edison entered into an assurance of discontinuance — captioned “In the Matter of Consolidated Edison of New York” — to resolve the investigation.
In this settlement (which was reviewed by the Administrative Judge of the Civil Court) Con Ed agreed to use *806 specified revised documents in its replevin actions. The agreement states “[i]t is the judgment of the Attorney General that the specified revised documents are in compliance with HEFPA.” It is those documents which are under review here.
Although the opinions of the Attorney-General are entitled to strong consideration, they are not conclusive or binding on courts. (See, e.g., People v Hirschfield, 41 Misc 2d 400; Matter of Grenader v Lefkowitz, 71 Misc 2d 414; Shpack v Baretti, 75 Misc 2d 901; 55 NY Jur, State of New York, § 24.) Thus, notwithstanding the apparent imprimatur given to these applications, they nevertheless must withstand the court’s scrutiny. For the reasons stated below they fail to do so.
While the Attorney-General’s interest in insuring compliance with HEFPA is commendable, his office apparently overlooked the absolute lack of probative value of the form affidavits which it approved. The agreement also failed to see that those affidavits present no convincing facts showing that the requirements of CPLR article 71 on HEFPA have been met.
The form affidavit approved by the Attorney-General (and used in these applications) allows it to be made by an administrative officer of the utility corporation who may not, and probably does not, have any personal knowledge of the facts. It also states that all of the facts contained in the affidavit are “upon information and belief * * * supplied to [the] deponent from records kept in the regular course of plaintiff’s business.” Put another way, all information in the affidavit is hearsay based on hearsay which is based on an assumption that plainly self-serving records (not claimed investigation) are true and complete. Allegations based merely on “information and belief” lack probative force. (Cedar Rapids Eng. Co. v Haenelt, 39 AD2d 275, app dsmd 31 NY2d 780.) At a minimum, a request for the invocation of this dire prehearing and prejudgment relief requires an affidavit from someone with personal knowledge of the underlying facts.
CPLR article 71 requires that an application for an order of seizure be supported by an affidavit which, among other things, shows plaintiff’s right to the chattel to be seized *807 and that defendant is wrongfully withholding the chattel. If the plaintiff is seeking an order allowing a Sheriff to break open, enter and search for the chattel, he or she must present facts sufficient to establish probable cause to believe the chattel is located at the particular location to be entered and searched.
Moreover, if the plaintiff is seeking an order without notice, he or she must also show “facts sufficient to establish that unless such an order is granted without notice, it is probable that the chattel will [be] unavailable for seizure by reason of being transferred, concealed, disposed of, or removed from the state, or will become substantially impaired in value.” (CPLR 7102, subd [c], par 7.) Despite these unmistakably clear statutory requirements, other than a conclusory statement, these affidavits state no facts to establish even probable cause, much less actual fact, that the gas meters are at a particular location. In fact, they do not even specify the location of the meters but allege, instead, “the meter(s) is (are) located within defendant's)’ apartment or dwelling or the public areas of the building.”
The affidavits also are silent on whether, unless the order of seizure is granted without notice, the meters will be “transferred, concealed, disposed of, or removed from the state, or will become substantially impaired in value.” (CPLR 7102, subd [c], par 7.) Given the improbability of a residential gas user doing any of these acts, such silence is not surprising.
The affidavits contain no reliable information to show that plaintiff has complied with any of the special procedures enacted to protect the very ill, the elderly, blind, or disabled or residential customers during cold weather periods.
To the contrary, this hearsay form affidavit merely states that “[t]he defendants] is/are not known to be ‘elderly, blind or disabled’ as those terms are defined under PSL § 32 (3) and the implementing regulations.” It does not state what steps, or whether there were any steps taken by plaintiff to make such a determination.
The affidavit also fails to detail any effort, let alone the requisite diligent effort, plaintiff made to contact by tele *808 phone or in person “an adult resident at the customer’s premises at least 72 hours prior to termination of service for the purpose of devising a [payment] plan” (16 NYCRR 11.5 [b] [2]) or referring the customer to the Department of Social Services. In fact, the affidavit is quite clear that the only attempts by plaintiff’s employees to gain access to the premises were to disconnect its meters.
The affidavit also contains no reliable information or concrete factual basis to show that the termination of service during this cold weather period has been undertaken in compliance with the pretermination requirements mandated by HEFPA.
It is plaintiff’s position that these applications are a “final step, in a long and complex process designed specifically to avoid termination of service.” Thus, plaintiff has submitted to the court various notices which, it says, it sends to its customers before it resorts to replevin. However, these notices are forwarded to the very people least likely or able either to read or respond to them, namely, the very sick, the blind, the elderly or the disabled. Thus, the legislative rationale behind the requirement that a utility company make a reasonable effort to identify those customers eligible for the special protection given to them by HEFPA and a diligent effort to establish personal contact with these particular classes of people before terminating service is obvious. Nevertheless, the affidavits presented here fail to detail any efforts plaintiff may have made with reference to these requirements. Absent such a factual showing, the “affidavits” are facially deficient and the applications must be denied.

 In Richy plaintiff is seeking to remove the gas meter from a two-family dwelling on a claimed nonpayment of $231.69; in Davis plaintiff seeks to remove the gas meter of a “6 to 25 family dwelling” for nonpayment of $86.66; Father Lorenzo involves removal of a meter from a “26 or more family dwelling” for a claimed default in payment of $96.09; and in Lewis plaintiff is seeking removal of a gas meter from premises containing “26 or more families” because of an accrued unpaid bill of $55.23.