**In re UNDERWATER COMPLETION TEAM, INC., Debtor in Possession.**

**KONGSBERG NORTH AMERICA, INC., Plaintiff,**

**v.**

**UNDERWATER COMPLETION TEAM, INC., Defendant.**

**Bankruptcy No. 482–00793–LO.**
**Adv. No. 483–0002.**

United States Bankruptcy Court, W.D. Louisiana.

Oct. 7, 1983.

Wesley W. Steen, Steen, Rubin, Curry, Colvin & Joseph, Baton Rouge, La., for plaintiff.

Oscar W. Boswell II, Reggie, Harrington & Boswell, Crowley, La., for Louisiana Bank & Trust Co.

William C. Sandoz, Lafayette, La., for debtor in possession.

## OPINION

RODNEY BERNARD, Jr., Bankruptcy Judge.

This matter is before the court pursuant to a motion filed by Kongsberg North America, Inc. to determine its secured status. A hearing on the motion was held on June 1, 1983.

On the 1st day of November, 1982, the debtor, Underwater Completion Team, Inc. filed for reorganization under Chapter 11 of the Bankruptcy Code. The debtor was continued in possession and management of its business immediately thereafter as debtor in possession.

The debtor corporation operates as a diving company that specializes in subsea completion of oil and gas wells. In January, 1981, the company completed and launched an all aluminum catamaran diving support vessel, The Oil Screw Cuz I. The M/V Cuz I is the principal asset of the debtor corporation. According to the schedule of assets filed by the debtor, the M/V Cuz I is valued at approximately $6,000,000.00. The vessel is equipped with state of the art equipment including computerized dynamic positioning and ultramodern support systems.

Kongsberg North America, Inc. (Kongsberg) contracted with Underwater Completion Team, Inc. (UCT) on April 15, 1981, to deliver a Dynamic Positioning System to UCT and to install same aboard the M/V Cuz I. The Dynamic Positioning System is a specially fabricated control system designed to control the operation of four "omnithruster" thrust directors that function to propel and position the vessel, for the purpose of maintaining position and providing slow speed propulsion during diving operations.

On May 1, 1981, UCT placed a preferred ship mortgage on the M/V Cuz I in the amount of $6,000,000.00. This was done in the form of a collateral mortgage and note in favor of Louisiana Bank and Trust of Crowley, Louisiana. The collateral mortgage and mortgage note were pledged to and received by Louisiana Bank on May 1, 1981, and have been held by the bank ever since. This mortgage was properly recorded in the offices of the United States Coast Guard, Morgan City, Louisiana, on May 4, 1981, in PM–42, Instrument 110.

The Dynamic Positioning System furnished by Kongsberg was installed aboard the M/V Cuz I in August 1981.

On May 10, 1982, UCT placed a preferred ship mortgage on the M/V Cuz I in the amount of $6,060,000.00. This was done in the form of a collateral mortgage and note in favor of Louisiana Bank and Trust of Crowley, Louisiana. The collateral mortgage and mortgage note were pledged to and received by Louisiana Bank on May 10, 1982, and have been held by the bank ever since. This mortgage was properly recorded in the offices of the United States Coast Guard, Morgan City, Louisiana, on May 11, 1982, in PM–45, Instrument 50.

UCT's current indebtedness to Louisiana Bank is represented by two hand notes:

(1) One in the amount of $6,050,000.00 dated May 10, 1982; and

(2) One in the amount of $20,000.00 dated July 2, 1982.

Kongsberg claims to be secured by a Louisiana vendor's privilege on the equipment (Dynamic Positioning System) sold to UCT. Additionally, it claims to be secured by a preferred maritime lien against the vessel for furnishing "necessaries" to the vessel.

Louisiana Bank and Trust claims to be secured by two preferred ship mortgages on the vessel Cuz I.

The controversy at bar involves a ranking of the liens and/or privileges between the two competing creditors, i.e., Kongsberg and Louisiana Bank and Trust. Thus, the issues may be presented as follows:

1) Does Kongsberg have a valid Louisiana vendor's privilege on the equipment furnished to the vessel, and if so, from what date does it rank?

2) Does Louisiana Bank have a valid preferred ship mortgage lien on the vessel, and if so, from what date does it rank?

3) Does Kongsberg have a maritime lien against the vessel for furnishing "necessaries", and if so, is it preferred and from what date does it rank?

 The burden of proof is on the one claiming a vendor's privilege under Louisiana Civil Code art. 3217 and 3227. *Traylor v. Murphy,* 2 La.App. 593 (2nd Cir.1925). We are of the opinion that Kongsberg, the plaintiff in this adversary proceeding, has not met the burden of proving that it has a valid Louisiana vendor's privilege on the Dynamic Positioning System aboard the M/V Cuz I. A vendor's privilege on movables arises as a matter of law when a contract of sale is perfected in Louisiana. It exists against property sold as a substantive right incident to the contract sale. *W.T. Grant Co. v. Mitchell,* 263 La. 627, 269 So.2d 186 (1972), aff'd 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974).

 Kongsberg has failed to show that its contract of sale with UCT was perfected in Louisiana, thereby entitling it to the vendor's privilege. The record does not support such a finding and Kongsberg's claim to be secured by a Louisiana vendor's privilege is denied.

Next, we consider whether Louisiana Bank and Trust is secured by a preferred ship mortgage on the vessel Cuz I. Louisiana Bank is the holder of two collateral mortgages executed by UCT. These mortgages have been properly executed and are valid security devices under Louisiana law. Furthermore, the two collateral mortgages are entitled to the status of "preferred ship mortgages", as they meet the requirements of 46 U.S.C. § 922. They have been properly recorded at the offices of the United States Coast Guard in Morgan City, Louisiana, and the Coast Guard has endorsed the existence of these encumbrances upon the documents of the vessel. 46 U.S.C. § 922. The lien of a "preferred ship mortgage" has priority over all other claims against the vessel except (1) preferred maritime liens,

and (2) court costs and related expenses. 46 U.S.C. § 953(b).

The key issue with respect to the preferred mortgages held by Louisiana Bank is whether they rank from May 1, 1981 or from May 10, 1982. If the mortgages rank from May 1, 1981, the preferred mortgage lien would have arisen before the Dynamic Positioning System was installed aboard the vessel Cuz I, in August of 1981. On the other hand, if the preferred mortgage ranks from May 10, 1982, the Dynamic Positioning System's installation would pre-date the preferred ship mortgage.

 One mortgage in favor of Louisiana Bank is dated May 1, 1981 in the amount of $6,000,000.00; the other is dated May 10, 1982 in the amount of $6,060,000.00. Both are collateral mortgages. In Louisiana, three species of mortgage exist. We have conventional, legal, and judicial mortgages. Three types of conventional mortgage are recognized in Louisiana: the ordinary mortgage, the mortgage to secure future advances, and the collateral mortgage. The collateral mortgage is the product of judicial recognition that one can pledge a note secured by a mortgage and use this pledge to secure yet another debt. *First Guaranty Bank v. Alford,* 366 So.2d 1299 (La.1978).

> "It is elementary that a collateral mortgage does not create or represent a debt itself, but rather is a useful and common device for the securing of direct obligations, normally represented by a handnote." *Allied Mortgage and Development Co. v. Warner,* 185 So.2d 635, 638 (La.App. 1st Cir.1966).

UCT's actual indebtedness to Louisiana Bank is represented by two handnotes: 1) a promissory note dated May 10, 1982 in the amount of $6,050,000.00, and 2) a promissory note dated July 2, 1982 in the amount of $20,000.00. Louisiana Bank urges that its ranking as a secured creditor of UCT should relate back to May 1, 1981, when the collateral mortgage and mortgage note in the amount of $6,000,000.00 were pledged to the bank. UCT subsequently executed and pledged a collateral mortgage and mort-

gage note in the amount of $6,060,000.00 to Louisiana Bank on May 10, 1982.

Kongsberg asserts that UCT did not intend to pledge the 1981 mortgage note to secure the debts incurred in 1982, that are represented by the two handnotes. According to Kongsberg's reasoning, the bank's security could only rank from May 10, 1982, when the second collateral mortgage note was pledged to the bank, and when the handnote for $6,050,000.00 was executed. We do not adopt Kongsberg's line of reasoning.

A collateral mortgage ranks from the date the mortgage note is pledged. *Mardis v. Hollanger,* 426 So.2d 392 (La.App. 2d Cir.1983); *Wallace v. Fidelity National Bank,* 219 So.2d 342 (La.App. 1st Cir.1969), writ refused 253 La. 1083, 221 So.2d 517 (1969). The first mortgage note in this case was pledged by UCT to Louisiana Bank and Trust on May 1, 1981. The bank has held the mortgage note as pledgee ever since. The mere giving of a note does not effect a novation of a debt unless it is so intended, which intention may be established by the terms of the agreement or from the acts of the parties. *Smith, Howard & McCoy, Inc. v. Acme General Contractors, Inc.,* 152 So.2d 596 (La.App., 2nd Cir.1963). Taking a new note in renewal of an old one does not operate as a novation, or extinguishment, of the original debt or the pledge securing it. *Mardis v. Hollanger, supra* at 398.

The pledge of the second mortgage note by UCT to Louisiana Bank on May 12, 1982 did not constitute a re-issuance of the collateral mortgage. A re-issuance, by which a new date of ranking is established, only occurs if the pledgee releases possession of the original pledge. If the creditor-pledgee retains possession of the originally pledged mortgage note, subsequent debts or future advances that are represented by handnotes will be secured by the original pledge. Thus, the ranking of the secured creditor will relate back to the date of the original pledge. Here, the bank intentionally retained possession of the $6,000,000.00 mortgage note pledged to it by UCT on May 1, 1981, specifically to protect its ranking. Louisiana Bank's se-

curity interest in collateral of the debtor, therefore, relates back to May 1, 1981.

Finally, we reach the third issue presented. That is, whether Kongsberg has a maritime lien against the vessel, and if so, whether it is a preferred maritime lien, and, from what date does it rank.

The term "necessaries" in 46 U.S.C. § 971 has been interpreted broadly.

"[T]he present state of the law is not far from the point where any service which is 'convenient, useful and at times necessary' may qualify as a lien under the Lien Act. G. Gilmore & C. Black, The Law of Admiralty 658 (2nd Ed.1975). Thus, 'other necessaries' has been defined to include 'those items or services which a prudent owner or master would deem to be reasonably required to facilitate the use of the ship, save her from danger and enable her to perform those acts currently demanded of her.... [T]he furnished goals and services must be reasonably needed for the venture in which the ship is engaged'. 2 I. Hall, A. Sann & S. Bellman, Benedict on Admiralty 3–27 (7th ed. 1975)." *Clubb Oil Tools, Inc. v. M/V George Vergottis,* 460 F.Supp. 835, 840–41 (S.D.Tex.1978).

It is the opinion of this court that the Dynamic Positioning System furnished and installed aboard the M/V Cuz I by Kongsberg qualifies as a "necessary", and, thus, gives rise to a maritime lien against the vessel. The Dynamic Positioning System enables the Cuz I to perform the acts demanded of her and is the type of equipment which is reasonably needed for the venture in which the vessel is engaged. The equipment is designed to keep the vessel in a stationary position while diving operations are conducted in deep water. It replaces the function that manual anchoring would serve since traditional anchoring techniques are ineffective in deep water. It must be said that the Dynamic Positioning System is a "necessary" to this vessel. Thus, Kongsberg is entitled to a maritime lien pursuant to 46 U.S.C. § 971.

Under the provisions of 46 U.S.C. § 953(a) the claim of Kongsberg can be a "preferred maritime lien" only if it arose

prior in time to the recordation and endorsement of the "preferred ship mortgage" of Louisiana Bank and Trust Company.

We have already determined that Kongsberg is entitled to a maritime lien against the vessel Cuz I. This maritime lien arose in August 1981, when the Dynamic Positioning System was actually installed aboard the vessel. We have also determined that Louisiana Bank's preferred ship mortgage lien ranks from May 1, 1981. Kongsberg's maritime lien did not arise prior in time to Louisiana Bank's preferred ship mortgage lien. Thus, Kongsberg does not have a preferred maritime lien, but Kongsberg is the holder of a valid maritime lien.

In summary, Kongsberg is denied secured status on the basis of a Louisiana vendor's privilege for failure to prove the existence of same. Louisiana Bank is entitled to secured status as the holder of a preferred ship mortgage lien against the vessel pursuant to 46 U.S.C. § 922 et seq., ranking from May 1, 1981. Kongsberg is entitled to secured status pursuant to a maritime lien against the vessel, ranking from August, 1981.